WALTER T. MOONEY, Appellant, v. MONARK GASOLINE & OIL COMPANY.
—298 S. W. 69.

Division One, September 16, 1927.

1. **NEGLIGENCE: Pleading: Scientific Fact: Latent Properties of Gasoline:
Ignition: Ordinary Care: Collateral Issue.** The petition of a keeper of an
oil filling station, whose clothes caught fire when he opened a stove in the
office, charging the defendant, the owner of the station, with negligence
"in furnishing him with a pump with a defective and insecure valve at the
end of the hose, which would permit gasoline to escape and spray his clothes,
when defendant knew, or by the exercise of ordinary care could have known,
that plaintiff in the performance of his duties was required to work about
said lighted stove, and to keep the fire burning therein, and that plaintiff's
clothing, on account of the gasoline fumes thereon, might become ignited,"
and "in failing to warn plaintiff of the danger of going into proximity of
fire after his clothes had been recently sprayed or saturated with gaso-
line, as aforesaid, even after his clothes had become apparently dry, and
of the likelihood or danger of gasoline fumes remaining in plaintiff's
clothing sufficiently to cause the same to become readily ignited after hav-
ing been recently sprayed or saturated with gasoline, even though appar-
ently dry," sufficiently charges that clothing, which has been sprayed and
saturated with gasoline, although apparently dry, will still contain a
sufficient quantity of gasoline to vaporize when brought into a warm room
and to ignite when brought near an open fire; and that defendant knew, or
by the exercise of ordinary care might have known, such latent qualities of
gasoline, and the danger of the gasoline fumes igniting when the recently
sprayed clothes were brought near an open fire, even though then appar-
ently dry, and hence it cannot be held that the existence of such scientific
fact and defendant's knowledge thereof are mere collateral issues, which are
not raised by the pleading.

2. ———: ———: ———: **No Demurrer or Motion.** A defendant which
files no demurrer to its servant's petition or a motion to make it more defi-
nite and certain, should not after verdict be heard to insist that the petition
did not allege that gasoline has peculiar and latent qualities and that
plaintiff cannot recover for injuries due to such latent properties, where
the petition charges that defendant knew, or by the exercise of ordinary
care could have known, that the servant's clothes, having recently been
sprayed with gasoline and become apparently dry, would likely become
ignited, from fumes remaining in the clothing, when he went near an open
fire, as was his duty, and failed to warn him of the danger that they would
become ignited.

3. **PLEADING: Evidentiary Facts: Latent Qualities of Gasoline.** The peti-
tion should not state the evidence by which the ultimate facts relied on are

to be proved. Proof of the peculiar and latent qualities of gasoline, even though a scientific fact, is merely evidentiary of the ultimate fact relied upon by a servant who, after his clothes were saturated with gasoline and had to the senses become dry, entered a warm office, and attempted to replenish the fire in a store, whereupon his clothing became ignited from the latent fumes in them.

4. NEGLIGENCE: Proof: Latent Qualities of Gasoline: Knowledge of Superintendent. The defendant is chargeable with knowledge of its superintendent; and testimony by the superintendent that he had seen clothing, after it had had gasoline on it and after it had become dry, take fire, without being right near to a fire, is proof that defendant knew the peculiar and latent qualities of gasoline.

5. ———: Latent Qualities of Gasoline: Further Proof: Expert. Testimony of an expert and experienced chemist that the clothing of the keeper of an oil filling station which had become wet with gasoline, after being in the open air, in zero weather, thirty to forty-five minutes, may appear to be perfectly dry to touch, sight and smell, and yet the gasoline fumes or vapors may still be in the keeper's clothing and ignite it when he enters a warm room and approaches a lighted fire, is further proof of the latent qualities of gasoline, and very applicable to the circumstances of the keeper's injuries in this case.

6. ———: ———: Knowledge: Scientific Research: Duty of Dealer to Warn. A defendant who handles and deals with a highly volatile and inflammable commodity of latent and peculiar properties, is legally chargeable with knowledge of such qualities and characteristics, even though the knowledge is to be derived from scientific research and investigation; and there devolves upon him the duty or obligation to acquaint his servant with, and to warn him of, the dangers incident to such latent and peculiar properties of the commodity.

7. ———: Contributory: Matter of Law: Obedience to Directions. It cannot be ruled that a servant was guilty of contributory negligence as a matter of law where his conduct and course of action in the particulars assigned were largely influenced by and were in obedience to the directions and assurances of the master.

8. ———: ———: ———: Knowledge. A servant cannot be held guilty of contributory negligence as a matter of law who had no knowledge of the peril to which he was subjected; and although he had knowledge of a defect in a tool or appliance by which he was injured, he is not chargeable with contributory negligence for using it, unless there is a showing that he appreciated the danger. Nor is he guilty of contributory negligence if he relies upon the assurances or representations of the master that the work, or place, or tools are safe, or upon his promise to protect and guard him from danger, unless the danger is so obvious and imminent that no ordinarily prudent person would undertake to perform the service.

9. ———: Intervening Act: Proximate Cause: Chain of Causation. It will not be held that the casualty was caused by the servant's own independent and voluntary act, where he was directed by the master to perform that act, and had no knowledge and was not warned of its danger. If all the negligent acts, assurances of safety and failure to warn against latent and unknown dangers, including the asserted independent act, taken together, constituted one continuous succession of events, so linked together as to make one natural whole and proximate cause of the servant's injury, unbroken by any new or independent and intervening cause, the claimed independent act was not the proximate cause.

10. ———: Right to Verdict. Having made substantial proof of every essential allegation and specification of negligence charged in a sufficient

petition, and nothing appearing to justify a holding that plaintiff was guilty of negligence as a matter of law, and the plaintiff's contributory negligence and defendant's negligence having been properly submitted to the jury as questions of fact, plaintiff is entitled to a verdict.

11. NEW TRIAL: Order Sustainable on Any Ground.  The appellate court must sustain the order of the trial court granting to defendant a new trial if any proper or sufficient ground of error was raised in the motion and is preserved in the record, whether or not such ground was the one assigned by the trial court as the basis for its order.  But in this case neither the grounds assigned by the trial court, nor any other ground preserved in the motion, authorized the court to grant to defendant a new trial, and the order granting a new trial is reversed, and the cause remanded with directions that the order be set aside and that judgment be entered for plaintiff for the amount of the verdict, with interest from its date.

12. NEGLIGENCE: Instruction: Superintendent: Vice-Principal.  Where defendant's witness testifies that at the time of plaintiff's injury he had charge of the service and upkeep of the equipment of the filling station where the casualty occurred and that the attendants at the various stations were under his control and direction, an instruction which requires the jury to find that said witness "was the superintendent of defendant company and that he had supervision over plaintiff" sufficiently submits the issue whether such witness was a vice-principal of defendant, and is not erroneous.

13. ———: ———: Oil Filling Station: Replenishing Fire: Plaintiff's Knowledge.  In an action for damages by the keeper of a filling station who, after his clothes had become wet from gasoline escaping from a defective hose, went, thirty or forty minutes later, into the office and put coal in a stove, whereupon his clothes immediately took fire, an instruction telling the jury that "even though you find from the evidence that plaintiff knew or by ordinary care could have known of the danger arising from attempting to replenish fire in the manner and in the circumstances shown in evidence, yet if you further find from the evidence that in so attempting to replenish said fire he acted in obedience to and in conformity with an order of defendant, and with ordinary care and caution, and that defendant negligently gave plaintiff said order, then the mere fact that plaintiff knew or by ordinary care could have known of such danger, will not debar plaintiff from recovering in this action, unless you further find from the evidence that such danger was so glaring, threatening and imminent that an ordinarily prudent person would not have attempted to so replenish said fire in the same or similar circumstances," awkwardly expressed the pertinent law, but its giving was not reversible or prejudicial error.

14. ———: ———: Whole Case.  An instruction for plaintiff, purporting to cover the whole case, which assumes the existence of no fact hypothesized therein, but requires the jury to find conjunctively that defendant was guilty of each and all specifications of negligence charged in a sufficient petition, is not erroneous.

15. HYPOTHETICAL QUESTION: Invasion of Jury's Province.  A hypothetical question propounded to an expert witness, which fully and fairly hypothesizes the material facts and circumstances in evidence, which raises no collateral issue not raised by the pleadings, and which does not call for the opinion of the witness respecting any ultimate fact in issue and necessary to be found and determined by the jury, does not invade the province of the jury, and is not error.

16. CONTINUANCE: Surprise.  An application for a continuance on the ground of surprise is addressed to the sound discretion of the court; and the court does not abuse its discretion in denying a motion for a continuance

based on an affidavit of surprise, filed and presented during the course of the trial, and grounded on the claim that plaintiff had not pleaded and proved that gasoline has the peculiar and latent properties claimed by him, and had not pleaded and proved that defendant knew or should have known that gasoline had such properties, where plaintiff had alleged that defendant knew, or by the exercise of ordinary care could have known, that plaintiff's clothing, on account of the gasoline fumes thereon, might become ignited, and knew or might have known of the likelihood and danger of gasoline fumes remaining in his clothing sufficiently to cause the same to become readily ignited after having been recently sprayed with gasoline, and where plaintiff has proved that, after his clothing had been sprayed with gasoline and had apparently become entirely dry, he went into the office and, as was his duty, attempted to put coal into a stove, and immediately his clothing caught fire.

17. **EXCESSIVE VERDICT: $10,000: Burns: Passion and Prejudice.** As plaintiff, twenty-seven years of age, was placing coal in a stove, his clothing caught fire from latent fumes of gasoline therefrom; his entire face, head, ears, neck, upper part of chest, back, and both arms, including the hands, were burned, and nearly the entire area covered by the burns was blistered; the right forearm, and the nerves and tendons of the forearm, became shrunken, and at the trial, twenty months later, were involved in scar tissue; the right forearm is smaller than the left, his eye-lashes and eye-brows were burned off, resulting in inflammation of the eyes; while reading, his sight is blurred and his eyes burn and water; the burns have resulted in his permanent disfigurement, which cannot be successfully corrected by skin grafting; the scar tissue is sensitive to touch, and in warm weather he suffers intense itching of the scars. **Held**, that a verdict for ten thousand dollars was not excessive, and its size does not indicate arbitrary and unreasonable passion and prejudice on the part of the jury, to whom plaintiff bared and exhibited the burnt portions of his body.

---

Corpus Juris-Cyc. References: **Damages**, 17 C. J., Section 361, p. 1057, n. 56; Section 408, p. 1091, n. 85. **Evidence**, 22 C. J., Section 597, p. 502, n. 8; Section 800, p. 712, n. 82. **Master and Servant**, 39 C. J., Section 555, p. 438, n. 12; Section 561, p. 446, n. 39; Section 604, p. 492, n. 28, 29; Section 1041, p. 830, n. 84; Section 1162, p. 927, n. 75; Section 1186, p. 962, n. 86; Section 1270, p. 1058, n. 39; Section 1279, p. 1081, n. 14; Section 1284, p. 1092, n. 43; Section 1383, p. 1202, n. 67; Section 1386, p. 1204, n. 74; Section 1388, p. 1204, n. 77. **New Trial**, 29 Cyc., p. 832, n. 60. **Pleading**, 31 Cyc., p. 49, n. 68; p. 661, n. 55; p. 717, n. 71. **Trial**, 38 Cyc., p. 1543, n. 68.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

REVERSED AND REMANDED (*with directions*).

*E. H. McVey, Samuel R. Freet* and *Lester G. Seacat* for appellant.

(1) The plaintiff was entitled to judgment on the verdict of the jury, unless he failed to make some proof of some essential averment of his petition, or so convicted himself of contributory negligence that reasonable minds could not draw different conclusions about it. Burgess v. Insurance Co., 230 S. W. 315; Burton v. Holman, 231 S. W. 630; Burtoh v. Wabash Ry. Co., 236 S. W. 338; Kepler v. Wells, 238 S. W. 425; W. J. Howey Co. v. Cole, 269 S. W. 955; Bender v. Ry. Co., 137 Mo. 240; Young v. Webb City, 150 Mo. 333; Ganey v. Kansas City, 259 Mo. 654; Barnett v. Delano, 187 Mo. App. 501;

Singleton v. Pac. Railroad Co., 41 Mo. 469. (2) The defendant was engaged in handling gasoline, a highly dangerous substance, and therefore was required to exercise the highest degree of care for the safety of its employees. Kings Co. Ins. Co. v. Swigert, 11 Ill. App. 590; Socola v. Chess Carley Co., 29 La. Ann. 344; Whittemore v. Laundry Co., 181 Mich. 564; McLawson v. Paragon Ref. Co., 198 Mich. 222; Ormsby v. A. B. C. Co., 253 S. W. 668; Myers v. Payne, 227 S. W. 633; Henderson v. Wilson Stove Co., 197 S. W. 177; Britt v. Crebe, 172 Mo. App. 426; Jewell v. Mfg. Co., 143 Mo. App. 200. (3) Plaintiff's evidence established defendant's liability on each and every one of the grounds of negligence specified in the petition, only one of which was sufficient to take the case to the jury and to sustain the verdict rendered; therefore the court erred in sustaining defendant's motion for a new trial on the ground that the demurrer to the evidence should have been sustained. Yarbrough v. Packing Co., 231 S. W. 72; Soeltz v. Provision Co., 260 S. W. 990; Troutman v. Oil Co., 234 S. W. 1916. (a) The evidence showed that the defendant knowingly maintained in service a worn-out and defective valve on a gasoline hose, because of which the plaintiff, an employee, was sprayed with gasoline, and, in tending a fire in the discharge of his duties, was burned because of the gasoline that had been sprayed on him, thus establishing defendant's liability. 39 C. J. 326, 338, 339. (b) The evidence showed that even though the defendant knew that the plaintiff was being sprayed with gasoline through the defective valve, it required him to work in an enclosed room and to keep a fire burning there after his clothes had been sprayed with gasoline, thus rendering the room an unsafe place to work. Waters-Pierce Oil Co. v. Snell, 47 Tex. Civ. App. 413; Cooper v. Fidelity Dev. Co., 131 N. Y. Supp. 457; Sorenson v. Selden Brick Co., 154 N. W. 222; Houston Belt Ry. Co. v. Wood, 149 S. W. 372; Moeckel v. Cross & Co., 76 N. E. 447; Stoeber v. Brewing Co., 79 Atl. 416; Ames v. Standard Oil Co., 233 S. W. 195; Allen v. Quercus Lumber Co., 190 S. W. 86; Henderson v. Wilson Stove Co., 197 S. W. 180; Richert v. Hammond Packing Co., 136 Mo. App. 565. (c) The evidence showed that gasoline was of such a nature that on a cold day it would evaporate slowly and in the meantime clothing wetted with gasoline would seem dry and free from it, but, when warmed inside a room with a fire in it, the gasoline would evaporate rapidly and give off fumes, so that when brought near the fire there would be danger of ignition; the evidence showed that the defendant had actual knowledge of this property of gasoline and, this being known to the science of the subject, the defendant was charged with knowing it. Plaintiff was not warned of this fact and in ignorance of it waited, after being wetted, until his clothing seemed dry, as he had been told by defendant's officers he could safely do, and then

attempted to fix the fire and was burned, and now contends that defendant is liable for such failure to warn him of this hidden peril of his employment. As to actual notice: See, 3 Labatt on Master & Servant, pp. 2707, 2771; Cunningham v. Railroad, 156 Mo. App. 617; O'Mans v. Packing Co., 151 Mo. App. 557; Reickert v. Packing Co., 136 Mo. App. 562; Highfill v. City, 189 S. W. 803; Dewcese v. Meramec Iron Min. Co., 128 Mo. 423. As to constructive notice: See, Mather v. Rilston, 156 U. S. 391; Hysell v. Swift, 78 Mo. App. 39; Nickel v. Columbia Paper Co., 95 Mo. App. 225; Cunningham v. Railroad, 156 Mo. App. 618; Zimmerman v. Pryor, 190 S. W. 26; Roehrig v. Car & Foundry Co., 257 S. W. 1086; Boynter v. Construction Co., 265 S. W. 841; Adams v. Ref. Co., 160 Mich. 590; Smith v. Car Works, 60 Mich. 501; Thompson v. United Laboratories, 221 Mass. 276; Wagner v. Chem. Co., 23 Atl. 772; Waters-Pierce Oil Co. v. Snell, 106 S. W. 170. (d) The evidence showed that plaintiff complained to defendant's officers about his clothes being sprayed through the defective valve and asked about going near the fire under those circumstances and was assured by them that if he would stay outside for a while and until he was dry, there would be no danger; plaintiff relied on these assurances, and after staying outside until he seemed dry, attempted to fix the fire as he was required to do, and was burned. Plaintiff contends defendant is liable because it gave him false assurances of safety upon which he acted. Highfill v. City, 189 S. W. 803; Gilbert v. Hilliard, 222 S. W. 1027; Jewell v. Bolt & Nut Co., 231 Mo. 195; Hays v. Sheffield Ice Co., 282 Mo. 446; Wilson v. United Railways Co., 181 S. W. 20; Carter v. Baldwin, 107 Mo. App. 229; Hayden v. Gravel Co., 186 S. W. 1195; Schaffner v. Massey & Co., 270 Ill. 207; Keegan v. Kavanaugh, 62 Mo. 230; Steinhauser v. Sprawl, 114 Mo. 551; Eckhardt v. Electric Co., 235 S. W. 119; Stephens v. Ry. Co., 96 Mo. 208. (e) The evidence showed that plaintiff brought the defect in the valve to the attention of the defendant's officers on various occasions and they promised plaintiff they would repair it, but never did, and the valve was defective when plaintiff was injured and he was injured because of the defective valve. This is a distinct and sufficient basis for liability. 18 R. C. L. 650. (4) The plaintiff cannot as a matter of law be declared to have assumed the risk, or be convicted of contributory negligence, the peril to which he was exposed and through which he was injured having been a latent and hidden one; the questions of assumption of risk and contributory negligence in this case were peculiarly questions of fact for the jury to determine. 18 R. C. L. 639, 649; Spinnell v. Goldberg, 275 S. W. 775.

*Lathrop, Morrow, Fox & Moore, George J. Mersereau* and *Richard S. Righter* for respondent.

(1)   The trial court was right in granting a new trial on the ground that respondent's demurrer to the evidence should have been sustained.   (a)   Plaintiff did not plead and did not prove that gasoline has the peculiar properties which are alleged to have caused this accident, and did not plead or prove that respondent knew or in the exercise of ordinary care should have known that gasoline has such qualities.   Chitty v. Iron Mt. Ry. Co., 148 Mo. 64; Nave v. Dieckman, 208 S. W. 273; Collins v. Hutchings, 194 S. W. 733; Secs. 1272, 1273, R. S. 1919; Compton v. Railroad, 147 Mo. App. 420; Politowitz v. Telephone Co., 115 Mo. App. 57; Bryan v. Lamp Co., 159 S. W. 754; Glenn v. St. Ry. Co., 107 Mo. App. 109; State ex rel. Boeving v. Cox, 276 S. W. 869; VanBibber v. Swift & Co., 286 Mo. 317, 228 S. W. 69; Doerr v. Brewing Assn., 176 Mo. 547; Smith v. Box Co., 193 Mo. 715; King v. Natl. Oil Co., 81 Mo. App. 155; Mather v. Rillston, 156 U. S. 391; Cunningham v. Railroad Co., 156 Mo. App. 618.   (b) The court properly granted a new trial because plaintiff was guilty of contributory negligence as a matter of law.   VanBibber v. Swift & Co., 386 Mo. 317; Bobnett v. Brewery Co., 238 S. W. 532; Moore v. Ry. Co., 146 Mo. 572; Hurst v. Ry. Co., 163 Mo. 309; Railroad v. Bivins, 103 Ala. 142; Railroad Co. v. Holborn, 84 Ala. 133; Rogers v. Packing Co., 170 S. W. 675; Hirsch v. Bread Co., 129 S. W. 1060. (c)   The defect in the valve in the pump, the failure of respondent to repair the same, and the alleged assurances of safety were not the proximate cause of the accident.   Glenn v. St. Ry. Co., 107 Mo. App. 109; State ex rel. Boeving v. Cox, 276 S. W. 869; VanBibber v. Swift & Co., 286 Mo. 317; Doerr v. Brewing Assn., 176 Mo. 547; Smith v. Box Co., 193 Mo. 715; George v. Mfg. Co., 159 Mo. 333; Nugent v. Milking Co., 131 Mo. 241; Coin v. Lounge Co., 222 Mo. 488.   (2)   The trial court was right in granting a new trial for reasons other than those stated by the court.   (a)   This court can sustain the trial court's ruling granting a new trial on any ground preserved in the record, whether assigned by the trial court as a ground for its ruling, or not.   Ittner v. Hughes, 133 Mo. 679; Haven v. Railroad, 155 Mo. 216; Johnson Grain Co. v. Railroad, 177 Mo. App. 194; Condee v. Ry. Co., 130 Mo. 154.   (b)   The trial court erred in giving Instruction 2 on behalf of appellant.   (c)   The trial court erred in giving Instruction 4 on behalf of appellant.   (d)   The trial court erred in giving Instruction 3, as modified by the court, on behalf of appellant. Edwards v. Structural Steel Co., 185 S. W. 1147; Trage v. Land & Lumber Co., 187 Mo. 227.   (e)   The trial court erred in overruling respondent's objection to hypothetical question asked Dr. Cross.   (f) The court erred in overruling respondent's motion for continuance and affidavit of surprise.   (g)   The amount in damages awarded by the jury was excessive, and so excessive as to indicate passion and

prejudice on the part of the jury. Rigg v. Railroad Co., 212 S. W. 878.

SEDDON, C.—Action to recover damages for personal injuries sustained by plaintiff and alleged to have resulted from the negligence of defendant while plaintiff was in its employment. The defendant is a corporation engaged in the sale of gasoline and lubricating oils, for which purpose it maintained and operated a number of gasoline and oil filling stations at several different locations in Kansas City, Missouri, one of said stations being located near the intersection of 29th Street and McGee Trafficway. Plaintiff was in the employment of defendant as an attendant at the latter station, and was painfully and severely burned about the upper part of his body when his clothing was ignited on the afternoon of February 28, 1922.

The substantive facts alleged in plaintiff's petition are: That defendant maintained at said filling station two pumps, located on a concrete base or platform extending north and south, one pump being at the north end, and the other pump being at the south end, of said base; that each of said pumps was connected with a large tank or reservoir of gasoline, and each pump was fitted with a cylindrical gasoline container, made of glass, and having a capacity of approximately ten to twelve and one-half gallons, with a gauge on the side thereof by which to measure the gasoline sold to customers therefrom; that there was a large hose connected with each container, at the end of which hose there was attached a nozzle and valve by which the gasoline, which flowed by gravity from the container when the valve was open, could be shut off upon closing the valve; that, at the time of plaintiff's injury, and long prior thereto, the nozzle and valve attached to the hose leading from the south pump and container was defective, so that the valve could not be controlled and would frequently open while plaintiff was handling the same, thereby causing plaintiff's clothing to be sprayed with gasoline; that plaintiff was required to maintain a fire in a coal stove in an enclosed room in said station as a part of his duties; that, prior to his injury, plaintiff "had complained to defendant about the said defective valve and set screw and about his clothing being sprayed with gasoline as aforesaid; that defendant promised to repair said valve and set screw and assured plaintiff that there would be no danger of injury therefrom or of his clothes catching fire from said stove if he would remain in the open air for a short time before working about said stove;" that, on February 28, 1922, plaintiff used the hose on the south pump or container for the purpose of filling the automobile tank of a customer; that, because of the defective condition of the nozzle and valve of said hose, gasoline was caused to escape therefrom upon plaintiff and his clothing; "that plaintiff remained in the open air a considerable time be-

fore going into the enclosed room where the said stove and fire was located, and avoided doing any work about said stove until his clothing was apparently free from gasoline; that it was a cold, snowy day, the fire in the stove had gotten low and said room was becoming cold; that plaintiff, in performance of the duties of his said employment, went to the said stove, opened the door thereof and was preparing to replenish the fuel therein, when his clothing, as the result of having been sprayed with gasoline as aforesaid, ignited, he became enveloped in flames and was severely burned, causing the bodily injuries hereinafter more particularly described.'' The petition charges defendant with negligence in these five respects:

"1. In furnishing him, as aforesaid, with a pump with a defective and insecure valve at the end of the hose, which would permit gasoline to escape and spray his clothing when defendant knew or by the exercise of ordinary care could have known that plaintiff in the performance of his duties was required to work about said lighted stove, and to keep the fire burning therein, and that plaintiff's clothing, on account of the gasoline fumes thereon, might become ignited.

"2. In requiring plaintiff to work in an enclosed room and to keep a fire burning in a stove located in said room after plaintiff's clothes had been recently sprayed with gasoline, as aforesaid, as defendant knew or by the use of ordinary care could have known.

"3. In failing to warn plaintiff of the danger of going into proximity of fire after his clothes had been recently sprayed or saturated with gasoline, as aforesaid, even after his clothes had become apparently dry, and of the likelihood or danger of gasoline fumes remaining in plaintiff's clothes sufficiently to cause the same to become readily ignited after having been recently sprayed or saturated with gasoline, even though apparently dry.

"4. In assuring plaintiff after he had made complaint to defendant of the defective condition of said valve and set screw that even though his clothing had been recently sprayed with gasoline there was no danger in his working about said stove and fire, if he would first remain in the open air for a short time.

"5. In failing to repair said defective valve and set screw after plaintiff had brought the defect therein to defendant's attention and after defendant had often promised to make said repair.''

The answer is a general denial, and states further that "the accident and injuries therein described, if any, were caused and contributed to solely by the carelessness and negligence of the plaintiff herein.'' The reply is a general denial.

Plaintiff's evidence tends to show that he was about twenty-seven years of age at the time of his injury, and had been in the employment of defendant, as a filling station attendant, for about two years, and had been employed at the particular station in question for about

a year. The station was on the west side of McGee Trafficway and consisted of an enclosed building, containing several small rooms, in front of which building was a north-and-south double driveway under· a canopy. In the center of, and dividing, the driveway was a concrete base or platform, upon which were mounted two gasoline pumps or containers, about six feet in height, one at the north end, and the other at the south end, of the platform. Each pump had a twelve and one-half-gallon glass container on the top, from the bottom of which container led a hose by means of which the tanks of automobiles were filled, the gasoline flowing from the container by gravity through the hose and into the automobile tank below. The hose was always filled with gasoline, as the containers were usually refilled by means of the pump whenever ten gallons of gasoline were sold from the container, and, if not immediately refilled, there usually· remained approximately two and one-half gallons of gasoline in the bottom of the container and the hose connected therewith. The hose itself contained approximately three-fourths of a gallon of gasoline. The gasoline was released from the hose by opening a valve in the nozzle attached to the end of the hose. For several weeks prior to plaintiff's injury, the plunger and set screw which controlled the opening and closing of the valve in the nozzle of the hose leading from the south pump or container had been defective and out of repair in that the set screw had been broken off and the plunger was worn and did not fit snugly into place in the valve, as a consequence of which defective condition, on several occasions prior to plaintiff's injury, a slight jar would cause the plunger to open and allow the gasoline to escape from the hose when hung upon a hook or receiver upon the pump, and plaintiff testified that he had·been sprayed or wetted with gasoline a number of times from this source. The evidence tends to show that plaintiff and another attendant of the station, some time prior to plaintiff's injury, had complained of the defective condition of the nozzle valve to two of their superiors, vice-principals of defendant corporation, namely,·one Smith, its president and general manager, and one Flaherty, who had charge of the service and upkeep of the equipment of defendant's filling stations.

Respecting his conversations with Mr. Smith, defendant's president and general manager, and with Mr. Flaherty, plaintiff testified: "I know that I spoke to him (Smith) three or four times, and I spoke to him three or four days before I was burned. I showed Mr. Smith, I called his attention to it, how it was worn, the valve, and I showed him.how the plunger went into the little hose I have spoken of before, through the cap that screws on to the valve, and showed him how easily it. could be wiggled around, and also showed him how, when it came open, it would let the gasoline out, and showed ·him the set screw, the condition of having. that, how it would not keep· the

plunger in place, why it could not be operated unless you opened up your set screw, loosened it up. I told him that I had gasoline on my clothes several times and the thing was in the habit of coming up, and what he thought about keeping up the fire if I should get gasoline on my clothes. Q. Now, when you told him those things, what did he (Smith) say? A. He told me to—he said stay outside for a while if I got any on my clothes, and there would be no danger; he said, you know you got to keep the building warm this cold weather. Q. What, if anything, did he say about your keeping up the fire in the stove after you were wet with gasoline? A. He told me that if I would stay outside a while there would be no danger, but he said, 'You know you have to keep the building warm this cold weather.' Q. Now, when you called his attention to it the first time, the condition of this valve, what, if anything, did he say about having the thing fixed? A. He said he would have it fixed. Q. About how often did you mention it to him? A. Three or four times. Each time he said, 'I'll get that fixed, I will have to have that fixed;' the last time I spoke to him, he says, 'I'll have to have it fixed right away.' Q. Did you speak to anybody else besides Mr. Smith about that and complain of that condition? A. Yes, I spoke to Mr. Albert Flaherty. Q. That was your superintendent there? A. Yes, sir. I told him that—showed him the valve, too, and how it worked, and asked him when he was going to put a new valve here, or a set screw, and he said he was busy, too busy at the time, but he would be out in a day or two and fix it. Q. Did anybody connected with the company ever have it fixed? A. No, sir. It was in that condition until I got gasoline on me and happened to the accident.'' On cross-examination, plaintiff testified: "Q. And you said you had some conversation with Flaherty? A. Yes, sir. Q. Now, that was before or after you spoke to Mr. Smith the last time? A. That was before. I asked Mr. Flaherty what he thought about going around the stove, too, and he said, well, if you was dry it would not be any danger. Q. Well, he told you just as Mr. Smith, you want to be dry before you went around the stove? A. Yes, sir.''

The testimony of witness Hoffman, another attendant of the same station, was corroborative of plaintiff's testimony respecting the defective condition of the valve and the complaint thereof made to defendant's vice-principals. Defendant's vice-principal, Flaherty, testified: "I would not be positive it was Mr. Mooney or Mr. Hoffman, although one of the two of them had spoken to me about it, but I would not be positive which one; also Mr. Smith called my attention to it personally himself. Q. About how long before the accident was it that either Mr. Mooney or Mr. Hoffman spoke to you about the condition of the valve or set screw? A. Well, I could not recall exactly, but it was, I should judge, ten days or two weeks; I could not

recall that exactly. As near as I remember I was in there one morning fixing some air line, and they showed me this valve with the thumb screw broken off and the plunger worn, and if I remember right, we had some valves ordered at the time, that is our special valve, a good many of these pumps, and you could not get them in Kansas City; so if I remember, I told them to go ahead and be as careful as possible and get along with it the best they could until we could get a valve, or get it fixed. Q. Did you promise them to fix it? A. Yes, sir. Q. Now, you say Mr. Smith spoke to you about it? A. Yes, sir. He told me, he came into the office and I happened to be there, and he told me he just came by No. 5 (the station in question), they had a bad valve out there, it should be taken care of.''

Plaintiff's evidence tended to show that it was one of the duties of his employment to keep the station building warm and to replenish the fire in the stove. Plaintiff testified: ''We had orders to keep our room warm; we have to have a warm room for the oils we have prepared in there; if it gets too cold, it is frozen there, and we have to keep a warm room for the oils, so it will pour easily; if oil gets thick it takes too much time to wait on a customer, and we have to keep the room warm for customers that come in there.'' The other attendant, Hoffman, testified that ''we were notified to keep heat in the office.'' Defendant's vice-principal, Flaherty, testified: ''Q. Well, Mooney and Hoffman were the attendants at this station? A. Yes, sir. Q. Were they under your control? A. Yes, sir. Q. What were your orders and directions, if any, to Mr. Mooney in respect to keeping the station, that is, the office and the oil room and the other two rooms, warm and comfortable during cold weather? A. Well, of course, that is the rules, the duties of the station man, to keep his place clean, neat, also the fire for both himself and customers that come in there. Q. Was Mooney instructed about it? A. That is one of his duties; we give everybody that instruction when we get them; that is one of their duties.''

Respecting the circumstances immediately preceding his injury, plaintiff testified that a south-bound automobile was driven into the west driveway and stopped at the south pump or container for a supply of gasoline. He testified: ''I waited on a car that came in to get gas, and I delivered the gas, and turned around to hang up, and hung up the hose, and was in the act of collecting the amount for the gas, when the gasoline came out on me, and I jumped around, of course, and closed the nozzle, shut the nozzle off. Q. Had you turned off the valve when this gasoline came out on you, had you turned off the valve? A. Yes, sir. Q. And what had you done with the valve, with the nozzle and hose? A. After I waited on the car, I closed the valve and hung the hose and the nozzle—the valve, it is all in one there—hung it on the hook, the receiver for it. Q.

And then what happened? A. Then I turned around to collect the amount for the gas, the purchase. Q. Then what happened? A. And then the gas came out on me, that is, while I was standing there the amount of the gas came out on me. Q. Had you done anything to make the gas come out on you? A. No, my coat below might have brushed up against the hose, I don't know.''

Plaintiff testified that he was standing under the nozzle valve at the time and that the nozzle hung a little higher than his head; that the gasoline struck on his cap and ran down his shoulders and about his neck and on the sleeves of his unionalls. ''I got pretty wet, I don't know just how wet, there was quite a little gasoline on me.'' After being thus wetted with gasoline, plaintiff testified that he remained out of doors, sweeping the driveways and walks, and otherwise busying himself about the station and waiting upon customers for twenty-five or thirty minutes, after which he had occasion to make change for a customer, and he felt of his clothes and they ''felt pretty dry,'' so he went into the building and procured the change for the customer, returned to the outside and resumed his work of sweeping the driveway and sidewalk for fifteen or twenty minutes. Plaintiff said that he was on the outside of the building approximately three-fourths of an hour in all, after being wetted with gasoline, before he went inside the building to replenish the fire in the stove. Respecting his examination of his clothing before entering the room to replenish the fire, plaintiff testified: ''I examined them thoroughly; I took my cap off and felt it and looked at it, and I patted myself as a fellow would, and I stuck my hands inside of my unionalls and felt the vest and my shirt, and I felt just as dry as I am feeling this coat right now, perfectly dry. I felt all over myself.'' Cross-examination: ''I just felt my hands like this on my sleeves and down in front, and looked at it and felt it, and opened up my unionalls and stuck my hands inside and felt my vest and my shirt inside, and everything felt perfectly dry; I gave myself a good examination before I went in, because I was going in to stay then and fix the fire. Q. Did you examine yourself after you got in the house there before you went to the stove? A. No, I examined myself outside and found that I was dry. Q. When you went in you made no further examination? A. No, sir. To the best of my ability, I thought I was dry when I went inside, and would not have went inside if I had not found I was dry. Q. And you would not have gone to the stove unless you were satisfied? A. No, sir. . . . Q. What did you do on those occasions when you were sprayed? A. You mean the occasions before I was burned that day? Q. Yes. A. I always stayed outside and kept away from the fire. Q. Why? A. Well, I didn't want to go around the fire with gasoline on my clothes. Q. Why not? A. Well, I knew better than to do that.

Q.   What was the reason?   A.   Well, I would not go around gaso-line, or fire, with gasoline on my clothes if I know it is on my clothes. Q.   Because you knew it is liable to catch fire?   A.   With gasoline on my clothes, yes, sir.   Q.   And on those occasions before when you got wetted, you stayed out until you got dry, wouldn't you?   A. Yes, sir.''

Respecting his reliance upon the assurance of safety given to him by defendant's officer, Smith, plaintiff testified:   ''Q.   Now, when you went into this room and undertook to replenish the fire, as you have described, after having been wet with gasoline, and stayed out-doors, as you have described, state whether you did that in reliance upon what Mr. Smith had told you about there being no danger for you to do that after staying outdoors for a while?   A.   Yes, sir, I did.   Q.   At the time that Mr. Smith gave you that order about fixing up the fire, to which you have testified, did you know or have any knowledge of any danger of going about the lighted fire, having been wet with gasoline and having stayed outdoors until you were dry? A.   No, sir.   After the clothes became apparently dry I didn't know there was any danger to go about the fire.   Q.   Did you know at that time or at any time before you were burned that there was danger, particularly in cold weather, of your going about the fire even though you stayed out long enough for your clothes to dry, such danger be-ing from fumes that might remain in your clothing.   A.   No, sir. Q.   State whether, if at all, you were in any way influenced in going about the fire, under the circumstances which you have detailed in your testimony, by the statement and order of Mr. Smith to which you have testified, and, if so, state how.   A.   Yes, sir.   Mr. Smith said there would not be any danger if I stayed out a while; I· stayed out a while and I didn't think there was any danger going about the fire if you were perfectly dry.   Q.   Was that on account of his state-ment to you?   A.   Yes, sir.''

At the time of plaintiff's injury, which occurred between one and two o'clock on the afternoon of February 28, 1922, the weather was cold and blustery, or gusty, and the temperature was close to zero, with a wind velocity of about twenty miles an hour.   The other at-tendant of the station, Hoffman, had gone to lunch, leaving plaintiff alone as the sole attendant in charge of the station.   The station office, according to plaintiff's testimony, was ''still warm, but beginning to get cool.''   The fire in the stove was getting low, although there were glowing or blazing coals in the stove.   After ringing up some sales upon the cash register and making an entry upon the sales sheet, plaintiff got the coal scuttle, which was partly filled with lumps of soft coal and slack, opened the door of the stove, placed the mouth of the scuttle in the door and was in the act of tossing some coal in the stove, when suddenly, in an instant, the blaze flared up and

plaintiff was "aflame all over." Plaintiff called for help and, after some time, an attendant of a near-by filling station heard his cries for help and responded with a fire extinguisher, by means of which he put out the flames and plaintiff was removed to the Research Hospital.

Dr. Roy Cross, a graduate chemist of fifteen years' experience, testified as an expert witness on behalf of plaintiff that "the cooler the atmosphere is, the more slowly the gasoline evaporates or vaporizes, and the hotter, the more readily." A question hypothesizing the facts and circumstances in evidence was propounded to the witness in which he was asked "whether, under the circumstances stated, plaintiff's clothing could have been perfectly dry so far as the man could determine by feeling, and that he had not detected any odor of gasoline coming from him, notwithstanding the dryness of his clothing, the gasoline vapors may still have been in his clothing when he entered the room and when he approached the stove?" Witness answered the question in the affirmative. The witness testified further that the zero temperature on the outside of the station building materially retarded evaporation of the gasoline in plaintiff's clothing and that the higher temperature in the room would increase the rate of evaporation of the gasoline in the clothing, thereby causing the clothing to throw off vapors and fumes, and that, "based on the facts that I have heard in the questions, it would probably be a difference of temperature of something like forty degrees, and this would provide for rather extensive evaporation."

The testimony of plaintiff, and of defendant's vice-principal, Flaherty, was to the effect that it was customary for drivers of automobiles, in using the double driveways of the station, to use the right-hand driveway, so that southbound automobiles would ordinarily use the south pump and northbound automobiles would ordinarily use the north pump, and that all station attendants, including plaintiff, were given orders by defendant to that effect, in order to prevent confusion and blocking of the driveways and to facilitate prompt service to customers. Plaintiff testified that it was impracticable to tie down with a string or rubber band the defective valve or nozzle connected with the south pump, because "you have too much trade to do that, you lose too much trade if you had done that."

The evidence on plaintiff's behalf tends to show the nature, severity and permanency of plaintiff's injuries, reference to which evidence will be made later in discussing the matter of excessiveness of the verdict. Defendant offered no evidence on its behalf, except the testimony of an oculist respecting the present condition of plaintiff's eyesight.

At the close of plaintiff's evidence, and again at the close of all the evidence, defendant requested the giving of peremptory instructions in the nature of demurrers to the evidence, which peremptory

instructions were refused by the trial court. The cause was submitted to the jury upon certain instructions given on behalf of the respective parties, and ten of the jurors returned a verdict finding the issues for plaintiff and assessing his damages at the sum of $10,000. In due time, defendant filed separate motions for new trial and in arrest of judgment. The trial court overruled defendant's motion in arrest of judgment, but entered of record an order sustaining defendant's motion for new trial upon the ground that the court should have sustained the demurrer to the evidence, wherefore it was ordered that the verdict and the judgment thereon be set aside and for naught held. Thereupon plaintiff was granted and allowed an appeal to this court from the order *nisi* granting a new trial.

I. Plaintiff and appellant, on the one hand, insists that the evidence herein clearly establishes defendant's liability upon each and all of the five specifications or assignments of negligence

**·Pleading:
Latent
Qualities of
Gasoline.**

charged in the petition, and, therefore, that the trial court erred in granting defendant a new trial upon the ground that defendant's demurrer to the evidence should have been sustained. Defendant and respondent, on the other hand, insists that the trial court committed no error in granting a new trial upon the ground aforesaid for the following reasons, which we will discuss and rule in the order designated: (1) Plaintiff did not plead and prove that gasoline has the peculiar and latent properties which are claimed by him to have caused his injuries, and did not plead and prove that defendant knew, or in the exercise of ordinary care should have known, that gasoline has such properties; (2) plaintiff has established by his own, or personal, testimony that he was guilty of contributory negligence as a matter of law; and (3) the defect in the valve in the nozzle of the hose, the failure of defendant to repair and remedy the same, and the alleged assurances of safety made to plaintiff by defendant's officers, were not proximate causes of plaintiff's injuries.

(1) Respondent contends that plaintiff, in order to recover damages for his injuries, relies upon certain peculiar and latent properties of gasoline, namely, that when clothing has been wetted or sprayed with gasoline and has been left or permitted to remain in the open air on a cold day until the clothing appears to be completely dry, nevertheless the clothing will still contain a sufficient quantity of gasoline to vaporize when brought into a warm room and to ignite when brought near an open fire; that, if such be a fact, it is nevertheless a scientific fact and not one which could be learned or ascertained from ordinary and common knowledge and experience; and that the petition does not charge defendant with actual knowledge of such scientific fact or that, in the exercise of due care, it should

have known such fact. Hence, it is claimed by respondent that the existence of such fact, and defendant's knowledge thereof, are merely collateral issues in this case, which are not raised by the pleadings.

The petition herein charges defendant with negligence "in furnishing him (plaintiff) . . . with a pump with a defective and insecure valve at the end of the hose, which would permit gasoline to escape and spray his clothing *when defendant knew, or by the exercise of ordinary care could have known,* that plaintiff in the performance of his duties was required to work about said lighted stove, and to keep the fire burning therein, and *that plaintiff's clothing, on account of the gasoline fumes thereon, might become ignited,*" and, furthermore, "in failing to warn plaintiff of the *danger* of going into proximity of fire after his clothes had been recently sprayed or saturated with gasoline, as aforesaid, *even after his clothes had become apparently dry, and of the likelihood or danger of gasoline fumes remaining in plaintiff's clothing sufficiently to cause the same to become readily ignited after having been recently sprayed or saturated with gasoline, even though apparently dry.*" (Italics ours.)

It appears to us that one of the ultimate issues presented by the foregoing allegations of the petition, and joined by defendant's answer, was whether defendant knew, or by the exercise of ordinary care should have known, the *danger* of gasoline fumes remaining in plaintiff's clothing after having been wetted or sprayed with gasoline, and after his clothing was apparently dry, and that plaintiff's clothing, by reason of the gasoline fumes thereon, might become ignited while he was in the performance of his duties in working about the lighted stove and keeping the fire burning therein. We think that the averments of the petition were amply sufficient to apprise defendant of the ultimate fact in issue, namely, whether there was *likelihood or danger* of the gasoline fumes remaining in plaintiff's clothing after having been recently wetted or sprayed with gasoline, even though his clothing had become apparently dry, so as to become ignited when brought near to the open fire in the stove, thereby making it the duty of defendant to warn plaintiff of such danger. Our statute (Sec. 1244, R. S. 1919) provides that "no party shall be required to state evidence in his pleading or to disclose therein the means by which he intends to prove his case." The statute is merely declaratory of an established and well-recognized rule of pleading and practice. We have repeatedly ruled that it is not necessary to state in the pleadings the evidence by which the ultimate facts relied on are to be proved. [Planet Financial Co. v. Railway Co., 115 Mo. 613; Alcorn v. Railroad Co., 108 Mo. 92, and cases there cited.] In our opinion, proof of the peculiar and latent properties of gasoline, even though such be a scientific fact, is merely evidentiary of the ultimate fact relied upon by plaintiff for a recovery herein, namely, the *danger* of

gasoline fumes remaining in plaintiff's clothing after having been recently wetted or sprayed with gasoline, although such clothing appeared to the senses of touch, smell and sight to be thoroughly dry and free from gasoline.

There is another reason, we think, why the petition herein should be held sufficient in its averments. The record does not disclose that defendant attacked the petition by demurrer, or by motion to make the allegations thereof more definite, before answering. In Zimmerman v. Pryor (K. C. C. A.), 190 S. W. 28; wherein the petition alleged that, while plaintiff was engaged in removing the boards or planks from a box car previously loaded with cement, large quantities of said cement were blown into plaintiff's eye, destroying the sight thereof, and "that said cement was poisonous and destructive to plaintiff's eye, and plaintiff, by reason of his youth and inexperience, was unacquainted with the dangerous and injurious effect of the cement upon and to the eye and could not and did not appreciate the danger therefrom;" and that defendants and their foreman failed and neglected to warn plaintiff of such danger. Said that court, in ruling the petition to be sufficient and impregnable against attack on appeal: "Counsel for defendants attack the petition on the grounds that it is fatally defective: First, for not alleging that defendants knew, or might have known, of the presence of cement or its dangerous character; and, second, for not alleging that defendants knew of the youth, inexperience, and lack of knowledge of plaintiff. . . . But by applying the liberal rule of construction which must be applied to a petition not attacked by demurrer, we hold that the constitutive facts under consideration are sufficiently pleaded, and that the defects pointed out by defendants are mere irregularities which were cured by defendants' answer to the merits."

**Waiver.**

Nor do we think that there is a failure of proof on the part of plaintiff respecting the dangerous and latent properties of gasoline and that defendant knew, or by the exercise of due care should have known, that gasoline has such properties. The proof tends to show that defendant had operated, for several years prior to the casualty in question, a number of filling stations, dispensing gasoline therefrom to its customers; and that one Flaherty had charge or supervision of the service and equipment of defendant's filling stations at the time of the casualty and had been in defendant's employ for about five years at that time. Flaherty testified that he had been in the gasoline business for twelve years; or, as he expressed it, "ever since filling stations started, you might say, in Kansas City, I have been around one." He testified: "Q. Have you been working right around with gasoline at all times? A. Yes, sir. Q. Have you ever seen gasoline take fire? A. Yes, sir. Q.

**Proof.**

Have you ever seen clothing or any cloth which had gasoline on it, and after it becomes dry, take fire? A. Yes, sir. Q. Without being right near fire? A. Yes, sir." The knowledge of Flaherty respecting the peculiar and latent properties of gasoline, of which he testified, is imputable to the defendant master. Mr. Labatt, in his standard text on Master & Servant (2 Ed.) vol. 3, p. 2771, sec. 1052, says: "There is complete unanimity upon the point that the master is chargeable with any knowledge possessed by a general or departmental manager or superintendent . . ."

Dr. Roy Cross, a chemist of fifteen years' experience, testified that he was familiar with the properties of gasoline; that the colder the atmosphere the more slowly gasoline evaporates or vaporizes, and the hotter the atmosphere the more readily it vaporizes; that a temperature of zero would very materially retard the evaporation of gasoline and the higher temperature of an enclosed and heated room would increase the rate of evaporation as soon as clothing which had been wetted or sprayed with gasoline was warmed by the temperature of the room; and he expressed the opinion, as an expert witness, that the clothing of a man which had been wetted with gasoline, after being in the open air, or out-of-doors, in zero weather for thirty to forty-five minutes, could have appeared to be perfectly dry so far as the man could determine by use of his senses of touch, sight and smell, and yet the gasoline fumes or vapors may still have been in his clothing when he entered the room and approached the lighted stove.

Handling and dealing in a highly volatile and inflammable commodity of latent and peculiar properties, as defendant did, we think **Knowledge of Latent Qualities.** that defendant is legally chargeable with knowledge of its peculiar and latent properties and characteristics, even though such knowledge be derivable from scientific research and investigation upon defendant's part, and that there devolved upon defendant the obligation or duty to acquaint plaintiff with, and warn him of, the dangers incident to the latent and peculiar properties of such commodity:

In Waters-Pierce Oil Co. v. Snell, 47 Tex. Civ. App. 416, 106 S. W. 170, the defendant oil company owned and operated a warehouse where it sold and distributed oil, gasoline, and other substances of like character, all being highly inflammable, and where it also maintained a cooperage shop in which it operated an open fire in a furnace. Defendant permitted cans of gasoline to stand in the cooperage shop, near said open furnace, and plaintiff, an employee of defendant, was injured by an explosion resulting from ignition of the gasoline fumes by the furnace fire. In ruling defendant's actionable liability for plaintiff's injuries, that court said: "Appellant was charged with the knowledge that such gases would be generated, and that they would fill the tank room and cooperage room, and that they

were highly inflammable and would probably be exploded and ignited by the open fire. . . . Petroleum and its sub-product, gasoline, and the gases generated by them were shown to be highly inflammable, and appellant, who had for years been handling them, was charged with that knowledge, and it was no defense to this action to show that the fire in the furnace had not ignited the gas before. . . . The owner or controller of · dangerous materials, such as gunpowder, dynamite or other explosives, is bound to exercise great care to prevent an injury which a prudent man would reasonably foresee might result from them. [Citing authorities.]"

In Adams v. Refrigerator Co., 160 Mich. 590, 125 N. W. 725, the defendant was engaged in the manufacture of porcelain-lined refrigerators, and as a part of its operations manufactured its own porcelain enamel. After being smelted, the molten enamel was drawn off into water to cause crystallization. Plaintiff had been employed at this work for some years and no accident had occurred in such process. Plaintiff undertook to draw off a quantity of the molten enamel into a small quantity of water and an explosion occurred, resulting in his injury. Defendant contended that no such accident had ever before occurred, and hence that defendant was not chargeable with knowledge of the liability of such unexplained accident to occur and, therefore, there was no duty on defendant's part to warn plaintiff of the danger of an explosion. Said that court, in ruling the point adversely to defendant: "The question is whether this scientific fact was one of which the defendant should have had knowledge, and should have made the plaintiff acquainted with. . . . In the present case, . . . the defendant was employing in its business substances and processes of which some one must have had, or should have had, some scientific knowledge. That an obligation rests upon an employer to acquaint an employee with the dangers which can be ascertained by a knowledge of scientific principles, and to which he would be in his ignorance otherwise subjected, is a recognized doctrine of the law. In Labatt on Master & Servant, pages 298-301, the writer states that the master is bound to 'take into account the properties of such substances as he employs for the purposes of his business, and the operation of familiar physical laws upon these substances.' . . . We think, therefore, it was a question for the jury on the proof as to whether this was a natural law which should have been understood by the defendant and communicated to the plaintiff."

In Thompson v. United Laboratories Co., 221 Mass. 276, 108 N. E. 1044, plaintiff was employed by defendant to pack into cans a rat poison, a compound containing nineteen per cent of arsenic, which, in handling, gave off a dust in a poorly ventilated room. Plaintiff, ignorant of the ingredients thereof, was poisoned thereby. In sustaining a judgment for plaintiff, that court said: "The defendant fur-

ther contends that upon all the evidence it cannot be asserted as matter of law that the plaintiff could or would be poisoned by the inhalation of dust containing arsenic, and therefore that it is not bound to foresee results of which common experience would not warn it and which only a specialist would apprehend. . . . As matter of law a master engaged in a business inherently dangerous to the life and health of employees is bound 'to become informed of those matters of scientific knowledge possessed by men of general education and information relative to the danger and hazard of the business in which he is engaged.' [Hysell v. Swift & Co., 78 Mo. App. 39; Latorre v. Central Stamping Co., 9 App. Div. 145, 41 N. Y. Supp. 99.] It is clear from the testimony of Professor Warren (an expert witness for plaintiff) that an investigation would have disclosed the fact that the mixture was volatile, might be inhaled easily under the conditions obtaining in the defendant's place of business, and so handled was unsafe. . . . In the case at bar the jury properly could find that the defendant should have foreseen that injury in some form, at some time, probably would occur to some one of the persons engaged in what might be found to be to them a most dangerous business.''

In Hysell v. Swift & Co. (K. C. C. A.), 78 Mo. App. 44, ELLISON, J., speaking for that court, said: ''We hold that a master must keep pace with scientific development and knowledge as it may affect the character of business in which he is engaged. It is said that he will be presumed to have such knowledge, and that if the foreman in charge of the dangerous work has not such knowledge, the master is guilty of negligence in not providing a foreman who has. [Smith v. Car Works, 60 Mich. 501.] It is the master's duty to become informed of the latent danger, Smith v. Iron Co., 42 N. J. L. 467, even though it be scientific information, if it be readily attainable.''

In Zimmerman v. Pryor, supra, 190 S. W. 28, the same court, speaking through JOHNSON, J., said: ''Finally it is argued that the evidence failed to show that defendants had knowledge, actual or constructive, of the presence and character of the special danger. . . . Lime and cement which contain a caustic poison of particular malignance to the tissue and structure of the eye are commodities carried by railroads so frequently and in such quantities that their injurious properties must have been known to defendants. In the performance of the duty of mastership to exercise reasonable care to provide plaintiff a reasonably safe place in which to work, the jury were entitled to infer that the defendants should have known that the boards were covered with the poisonous dust, and that to set an inexperienced laborer to work where dust from them would be thrown or blown into his eyes added a very serious danger to the natural hazards of his

service. Not to warn him of such danger was an act of negligence for the consequences of which the master should be held responsible.''

(2)   It is urged by respondent that the trial court properly granted a new trial upon the ground assigned by the court, because plaintiff's personal testimony discloses that he was guilty of contributory negligence as a matter of law in these four respects:

**Contributory Negligence.** First, plaintiff had the choice of two ways of performing his work—one safe, the other dangerous—and he .chose the dangerous method in using the defective hose nozzle attached to the south pump instead of using the hose attached to the north pump, which was in good repair; second, in standing beneath the defective hose nozzle after he had filled the tank of the customer's automobile and while he was collecting the charge from the customer; third, plaintiff could have tied a piece of string or wrapped a rubber band around the handle of the plunger of the nozzle and thereby have kept the valve from flying open when it should have remained closed; and fourth, plaintiff was negligent in attending to the fire in the stove at all after his clothing had been wetted or sprayed with gasoline.

We are of opinion that plaintiff's conduct, under the facts and circumstances in evidence, does not convict him of contributory negligence as a matter of law.   Whether he was contributorily negligent, we think, was a question of fact for the determination of the jury. The evidence tends to show that it was customary in the operation of defendant's filling station for southbound automobiles to be served from the south pump and for northbound automobiles to be served from the north pump, and that defendant had given orders or instructions to that effect to plaintiff and its other station attendants. There is no evidence in the record that the orders of defendant in this respect were altered or changed because of the defective hose nozzle attached to the south pump.   Plaintiff was serving at the time a southbound automobile which had been driven by a customer to the south pump in accordance with defendant's custom and rule. While it is unquestionably true that plaintiff would not have been wetted with gasoline had he not been standing directly beneath the defective nozzle, yet he was engaged at the time in the duties of his employment, which were to fill the automobile tanks of customers and collect from the customers the price or cost of the gasoline so furnished.   The nature and character of his duties made it necessary for him to be in close proximity to the pump with the defective hose nozzle and we think it was not incumbent on him, as a matter of law, to dodge, or to stand from under, the defective nozzle after every use of it and after it had been hung upon the hook or receiver provided for that purpose.   While the evidence tends to show that a piece of string or a rubber band might have been wrapped around

the handle of the valve plunger to prevent it from coming open, yet plaintiff testified that the only way in which the same could be used would be to tie the string or rubber band into a knot and such method of repair would have been impracticable because of the loss of time and the consequent loss of the customers' trade. Besides, Flaherty, defendant's service station foreman or superintendent, testified that he directed the station attendants "to go ahead and be as careful as possible and get along with it the best they could until we could get a valve, or get it fixed." Flaherty testified that it was plaintiff's duty to keep up, or replenish, the fire in the station building, and plaintiff testified that Mr. Smith, defendant's president, said to him: "You know you have to keep the building warm this cold weather." It therefore appears from the evidence before us that plaintiff's conduct was largely influenced by, and resulted from, the orders and instructions given to him by defendant, or its vice-principals, and that his course of conduct at the time was taken by reason of the assurances of safety made to him by defendant's vice-principals. According to plaintiff's testimony (which we must accept as true for the purposes of a demurrer to the evidence), he had no appreciation of the danger of going into the station building to replenish the fire in the stove after his clothing had been wetted with gasoline and after he had remained in the open air, on the outside of the building, for a period of from thirty to forty-five minutes until his clothing was apparently dry, so far as he could detect by the use of his senses.

The principle or rule is thus stated in 18 Ruling Case Law, pages 639-641: "The basis for denying a right of recovery to an employee who has sustained an injury in course of his employment, whether under the legal theory of contributory negligence or the more recently developed doctrine of 'assumption of risk,' is knowledge or notice of the danger on the part of the person injured. If, at the time of the injury, he had no knowledge of the peril to which he was subjected, he is entitled as a rule to be compensated by the employer; but, conversely, if he did have knowledge of the dangerous condition or instrumentality, all right of recovery is barred. . . . Whether in any particular case the employee did have, or ought to have had, knowledge of the peril is a question of fact for the jury's determination."

Again, in 18 Ruling Case Law, 649, it is said: "Although an employee may have had knowledge, as of a physical fact, of the defective condition of a tool, appliance or place, by reason of which he has sustained an injury, it by no means follows that he must have appreciated the danger to which he was exposed thereby. His general knowledge may not have been such as to give him any conception of the peril. The condition may have appeared perfectly harmless. If this is shown to have been the case, his right of recovery is not de-

feated, for it is an appreciation of the danger, not mere knowledge of the defect by which the danger is threatened, that bars his action. When the specific evidence submitted only goes to the extent of establishing knowledge of the defect, the question of his contributory negligence should not be withdrawn from the jury. Indeed, it can only be in rare cases if ever that the question becomes one of law.''

In 39 Corpus Juris, 830, the general rule respecting assurances of safety by the master is thus stated: ''A servant is not guilty of contributory negligence where he relies upon the assurances or representations of the master or his vice-principal as to the safety of the place of work, tools, machinery, or appliances, or upon his promise to protect and guard the servant from danger, unless the danger is so obvious and imminent that no ordinarily prudent person would undertake to perform the service. And the general rule applies even though the servant might have some misgiving as to the safety of the place, since he is ordinarily entitled to rely on the master's knowledge and judgment, unless his own judgment is so greatly opposed thereto that he does not in fact rely upon the master's opinion.''

The foregoing rule has been uniformly followed and applied by this court. In Burkard v. Rope Co., 217 Mo. 479, we said: ''It has uniformly been ruled by this court that where a servant is apprehensive that the place in which he is required to work is dangerous and unsafe, but relies, as the evidence in this case shows plaintiff did rely, upon the assurance of the foreman in charge of the work and in charge of the servant, that it is safe, and the servant is injured without any negligence upon his own part, the master is liable. [Citing authorities.]'' To like effect is Hayes v. Sheffield Ice Co. (Court en Banc), 282 Mo. 446.

(3)  It is insisted by respondent that the defect in the valve of the hose nozzle, the failure of respondent to repair the same, and the alleged assurances of safety given to plaintiff by defendant's vice-principals were not proximate causes of the casualty. Respondent argues that after plaintiff was wetted with gasoline it was entirely within his own discretion whether or not he replenished the fire at the time he did so; that his own testimony discloses that he knew the danger in going near the fire when his clothing was wet with gasoline and knew that it was dangerous to approach the fire unless his clothing was dry; that plaintiff, without any necessity for doing so, undertook to decide for himself whether his clothing was dry or not, and whether he would assume the risk of his possible mistake in judgment; hence, it is claimed that the casualty resulted, not from any negligent act of defendant, but from plaintiff's own independent act in voluntarily tending the fire after having himself passed judgment on whether or not it was safe for him to do so. However, the evidence tends to show that plaintiff had orders from defendant's presi-

dent, Smith, to keep the station building warm; that the day was a cold one and the temperature near zero; that the station room was beginning to get cold and the fire required replenishing; and that plaintiff undertook to replenish the fire only after taking the precaution and endeavoring to ascertain by the use of his senses that his clothing was dry and free from gasoline, all in accordance with the alleged assurances of safety theretofore made to him by both Smith and Flaherty, defendant's vice-principals. In our opinion, the defective nozzle valve by which plaintiff's clothing was wetted with gasoline; defendant's failure to repair the same within a reasonable time after its attention had been directed to the defective valve; the assurances of safety given by defendant's vice-principals to plaintiff; and the failure of defendant to warn plaintiff of the peculiar and latent properties of the gasoline which defendant handled and dealt in, when taken together, constituted a continuous succession of events, so linked together as to make one natural whole and proximate cause of plaintiff's injuries, unbroken by any new, independent and intervening cause.

In 22 Ruling Case Law, pages 132-135, it is said: "As has been aptly said, 'the intervener acts as a non-conductor and insulates the negligence.' To have this effect the new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring about the injurious result; a cause which interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result, that could not have been reasonably anticipated. The test is: was the intervening efficient cause a new and independent force, acting in and of itself in causing the injury and superseding the original wrong complained of, so as to make it remote in the chain of causation, although it may have furnished a condition by which the injury was made possible. . . . Nor can the rule be applied to relieve one of liability for one negligent act by interposing another, also committed by himself. [Citing Burger v. Railway Co., 112 Mo. 238.] . . . The general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result. . . . The question always is, Was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?"

A close analysis of plaintiff's evidence, as disclosed by the record herein, convinces us that there was substantial proof on plaintiff's part of each and all of the five specifications or assignments of negligence charged in the petition. Having made substantial proof of every essential averment of his petition, and plaintiff not being guilty of contributory negligence as a matter of law and his contributory negligence having been properly submitted to the jury as a question of fact, plaintiff was entitled to a judgment on the verdict and findings of the. jury; hence, the learned trial court erred in granting a new trial upon the ground that defendant's demurrer to the evidence should have been sustained. [Bender v. Railway Co., 137 Mo. 240; Young v. Webb City, 150 Mo. 333, 341, and cases there cited.]

II.   Respondent contends, however, that this court must sustain the action of the trial court in granting a new trial upon any proper and sufficient ground of error raised in the motion for **New Trial: Any Error.** new trial and preserved in the record, whether assigned or not by the trial court as ground for its action. We have conclusively so ruled. [Ittner v. Hughes, 133 Mo. 679; Haven v. Railroad Co., 155 Mo. 216; Candee v. Railway Co., 130 Mo. 142.] It is therefore urged by respondent that the action of the trial court in granting a new trial is rightly sustainable upon the grounds that the court erred in giving certain instructions on behalf of plaintiff, which grounds of error were presented by defendant's motion for new trial and preserved in the record herein.

It is claimed that plaintiff's Instruction No. 2 is erroneous because it is hypothesized upon the fact that "Albert Flaherty was the superintendent of defendant company and that he had supervision over plaintiff." The effect and purpose of the instruction was to submit to the jury whether Flaherty was a vice-principal of **Vice-Principal.** defendant, so that the acts, knowledge and conduct of Flaherty were the acts, knowledge and conduct of the defendant company. Flaherty himself testified that, at the time of plaintiff's injury, he "had charge of the service and upkeep of the equipment of the filling stations" and that the attendants at the various filling stations of defendant were under his control and direction. His own testimony disclosed that, regardless of the precise title of his office, nevertheless he was defendant's vice-principal. The jury could not have been misled to defendant's injury by reason of the fact that the instruction required them to find that Flaherty was the "superintendent of defendant company."

It is claimed that plaintiff's Instruction No. 4 is erroneous. That instruction reads: "The court instructs the jury that even though

**Replenishing Fire.**
you may find from the evidence that plaintiff knew or by ordinary care could have known of the danger arising from attempting to replenish the fire in the manner and in the circumstances shown in evidence, yet if you further find from the evidence that in so attempting to replenish said fire he acted in obedience to and in conformity with an order of defendant, and with ordinary care and caution, and that defendant negligently gave plaintiff said order, then the mere fact that plaintiff knew or by ordinary care could have known of such danger, will not debar plaintiff from recovering in this action, unless you further find from the evidence that such danger was so glaring, threatening and imminent that an ordinarily prudent person would not have attempted to so replenish said fire in the same or similar circumstances." While the instruction may be somewhat awkwardly drawn, yet we do not believe that the giving thereof constituted reversible or prejudicial error. A somewhat similar instruction was approved as rightly declaring the law in O'Mellia v. Railway Co., 115 Mo. l. c. 216, 218. See, also, Burkard v. Rope Co., 217 Mo. l. c. 479.

Criticism is leveled against plaintiff's Instruction No. 3, modified by the trial court and given as modified, upon several grounds. The instruction is lengthy and purports to cover the whole case. We see no useful purpose in quoting the instruction herein. We have given

**Whole Case.**
thoughtful consideration to the several grounds of criticism made against it, but we are of opinion that the instruction fairly, accurately and fully hypothesized the facts and circumstances in evidence and is well within the purview of both the pleadings and the proof. The instruction does not assume the existence of any fact hypothesized therein, but required the jury to find conjunctively that the defendant was guilty of each and all of the five specifications of negligence charged in the petition. Suffice it to say that we find no prejudicial or harmful error in the giving of plaintiff's instructions.

III. Respondent urges that the trial court erred in overruling its objections to the hypothetical question propounded to the expert witness, Dr. Cross, and affirmatively answered by him,

**Hypothetical Question.**
on the grounds that the question invaded the province of the jury, raised a collateral issue not embraced within the pleadings, and omitted certain elements or facts in evidence material to a correct answer thereof. We have carefully read and considered the hypothetical question, which is a lengthy one, in the light of the objections made thereto and are of opinion that the ques-

317 Mo. Sup.—81.

tion fully and fairly hypothesized the material facts and circumstances in evidence. We do not believe that the hypothetical question presented a collateral issue not raised by the pleadings, for the reasons heretofore stated in Paragraph I of this opinion. Neither do we think that the question invaded the province of the jury. The hypothetical question propounded to the expert witness did not call for the opinion of the witness respecting any ultimate fact in issue necessarily to be found and determined by the jury; hence, the question did not invade the province of the jury.

IV. Respondent insists that the trial court erred in overruling defendant's motion for a continuance and affidavit of surprise, which were filed and presented to the court during the course of the trial and were grounded upon the claim and contention of
**Continuance:** defendant that plaintiff did not plead and prove that
**Surprise.** gasoline has the peculiar and latent properties claimed by the plaintiff, and did not plead and prove that defendant knew, or should have known, that gasoline has such properties. A similar contention is discussed and ruled adversely to respondent in Paragraph I of this opinion. Furthermore, an application for a continuance on the ground of surprise is addressed largely to the sound discretion of the trial court. [13 C. J. 174.] We see no abuse of discretion herein by the trial court, and therefore we are of opinion that no prejudicial error was committed in the overruling of defendant's application for a continuance.

V. Lastly, respondent insists that the verdict, in assessing plaintiff's damages in the sum of $10,000, is palpably excessive, and so excessive as to disclose passion and prejudice on the part of
**Excessive** the jury. In ruling this contention it becomes necessary
**Verdict.** for us to state briefly the extent and nature of plaintiff's injuries, as disclosed by the printed record. The attending physician and surgeon testified that plaintiff suffered from numerous burns of the first, second and third degrees; that the entire face, head, ears, neck, upper part of the chest, back, and both arms, including the hands, were burned; that plaintiff was blistered nearly over the entire area covered by the burns; that, as the result of burns on the right forearm, the nerves and tendons of the forearm have become shrunken and are involved in scar, or cicatricial, tissue, resulting in loss of power and strength in the hand and forearm; that plaintiff's right forearm is smaller than the left forearm; that the eye-lashes and eye-brows were burned off, and the eyeballs were burned, resulting in inflammation of the eyes; that plaintiff suffered excruciating pain, making necessary the administration of opiates, while he was in

the hospital, in order to relieve his suffering; that the burns have resulted in a permanent disfigurement; and that plaintiff's disfigurement cannot be successfully corrected by skin grafting. Plaintiff was continuously confined to the hospital under daily treatment for a period of nine weeks and he was unable to resume his work until some three or four months after his injury. Plaintiff testified that, at the time of the trial, he was unable to sleep well at night; that, while reading, his sight is blurred and that his eyes burn and "water;" and that the scar tissue is sensitive to touch, and in warm weather he suffers from intense itching of the scars.

We are unwilling to say that the verdict herein is excessive. It appears from the record that plaintiff bared and exhibited the burned portion of his body before the jury, who had ocular evidence (necessarily denied to us in the printed record) of the nature, extent and severity of the burns suffered by plaintiff and of the character and extent of his disfigurement. It was within the province of the jury to determine and assess the amount of damages resulting from plaintiff's injuries, and we should not disturb their finding respecting the amount of plaintiff's damages unless there is a clear and positive showing in the record that the jury were arbitrary or unreasonable in their finding. We cannot say, from the record before us, that the jury were unreasonable or arbitrary in the assessment of the amount of plaintiff's damages.

It follows that the trial court erred in granting a new trial, and that the order *nisi* granting a new trial must be reversed and the cause remanded with directions to the trial court to reinstate the verdict of the jury herein and to enter judgment thereon as of the date of the original verdict and judgment, which was October 31, 1923. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.