CARL E. BURNESON v. ZUMWALT COMPANY, a Corporation, Appellant. —159 S. W. (2d) 605.

Division Two, December 16, 1941.

Rehearing Denied, March 13, 1942.

*Taylor, Chasnoff & Willson* and *James V. Frank* for appellant.

*Sigmund M. Bass* and *John Grossman* for respondent.

LEEDY, J.—This is an appeal from a judgment for $15,000 for personal injuries in an action brought by respondent (plaintiff) under the third party section of the Missouri Workmen's Compensation Act, Section 3309, R. S. '29, Sec. 3309, Mo. St. Ann., p. 8244. [Now Section 3699, R. S. '39.] The parties will be referred to as they were styled in the trial court.

Plaintiff was a carpenter foreman employed by the J. E. Williams Construction Company, which company was the general contractor in the erection of a building in the City of St. Louis for the G. C. Kirn Advertising Sign Company. Defendant Zumwalt Company was a subcontractor of said Williams Company for the installation of an overhead door in the rear of said building. There is no dispute as to the fact plaintiff was seriously injured by having been knocked from a stepladder as he was about to nail a block of wood on the jamb above the overhead door in question when it suddenly elevated. Plaintiff alleged it was caused to suddenly elevate with great force by reason of the negligent adjustment of the torsion spring, and this notwithstanding the fact he had secured the door by the lock provided for that purpose.

The nature of the first assignment of error (that the court should have directed a verdict for defendant because plaintiff's theory as to the sudden elevation of the door is contrary to the physical facts of the case, and contrary to known physical laws) necessitates a somewhat detailed statement of the facts.

I. Defendant installed the door on August 23, 1935, at which time installation was complete, except for the adjustment of the torsion spring, and except, also, the glazing and painting. The latter work (painting and glazing) was to be done by other contractors. The door in question was exceptionally high, its dimensions being nine feet in width, eleven feet in height, and one and three-quarters inches in thickness. It consisted of six horizontal or

crosswise sections each of which were divided into six panels. The two lower horizontal sections were solid wood. The four upper sections were so constructed as to accommodate six panes of glass in each. In other words, in addition to the two solid lower sections there were twenty-four window panes, in rows of six across, four deep. The panes of glass, which were of double strength, weighed approximately two pounds each, or forty-eight pounds in the aggregate. Unglazed and unpainted the door weighed approximately 400 pounds. The horizontal sections were held together at the outside edges by ten hinges, five on each outer edge of the door. The sections were also hinged in the center of the door. The hinges on the outside edges had a shaft or pin on which a wheel or roller operated in the "C"-shaped steel track which was bolted to the vertical jambs of the door. There were also two lower and two upper rollers or wheels which were not hinged, but they had similar floating brackets or shafts. The track curved near the top of the door, and then extended horizontally a distance of about twelve feet, thus permitting the several hinged sections to take the turn on the radius where it went overhead into a horizontal position. According to plaintiff's evidence the shafts or pins which formed a part of the outer hinges were of such length and construction as to permit "about three-quarters of an inch play" in the wheels or rollers when traveling in the track—"to let it work sideways."

The door was equipped with a locking device, a model of which has been lodged here. It was mounted on the inside of the door by means of metal brackets attached to the second section from the bottom of the door. It consisted of a metal bolt or bar "about an inch high and an eighth of an inch thick" and perhaps two feet in length. It extended horizontally from the vertical member between the first and second panels of said second section over to the track or guide rail. The cam, enclosed under a bracket, which operated by means of a T-handle, was at the left. At the right or other end of the bar, it engaged in a slot in the track which is referred to as the keeper. Below the bracket enclosing the cam is a spring lock sometimes referred to as a "night latch," which has the appearance of an ordinary Yale lock. It is mounted vertically. By giving the T-handle a quarter of a turn, thereby coming into the horizontal position, the locking bar is caused to be thrust into the slot in the track, the night latch "clicks" and locks the bar in that position. It is released by turning the handle or knurled knob of the so-called night latch. In that operation, the spring action is such that the bar is caused to be withdrawn from the keeper automatically and instantaneously and with considerable force.

Attached to the jamb above the door is a shaft upon which is mounted the torsion spring in question, which spring was about two and one-half feet in length and approximately four inches in diameter.

It was described as resembling an ordinary coil spring in appearance, it being circular in shape, and made from material approximately three-eighths or five-eighths of an inch in diameter. "The spring is hooked onto a shaft and they have a drum on each end of the shaft with a cable wound on that drum. The cable runs down to the bottom of the door and as they pull—when the door is up, as you pull this door down, the shaft, the cable spins the shaft and the shaft winds this spring. . . . The farther you pull it down the harder the tension gets, by winding up with that cable." Ropes are attached to each side of the casing which run through pulleys attached at the lower edges of the door. These ropes provide a means for pulling down the door when it would be otherwise out of reach. When the door is in a horizontal position the rope hangs down along both sides of the casing. There is a footplate attached to the lower section of the door which is used to push and hold the door down as the bottom of the door nears the floor in descending. There is also a handle or bracket below and to the left of the lock for use in raising and lowering the door.

It was developed without objection, that at about 8:30 A. M. on the day before plaintiff was injured another workman, one Schuester, was seriously injured by the sudden elevation of the same door while he was standing on a ladder and attempting to remove a block of wood which had been nailed on the jamb above the door. Defendant was notified of this occurrence by ▇▇▇ Mr. Kirn by telephonic communication with Maurice Zumwalt, president of defendant company. The latter fixed the time thereof as the evening of the day Schuester received his injuries. The next morning Zumwalt directed one of defendant's workmen, one Williams who had installed the door, to go to the job and inspect the door. However, on account of other work, he did not reach the scene of the accident until 4:00 or 4:30 P. M., and after plaintiff had been injured.

Plaintiff was not present when Schuester was injured, but he arrived on the scene shortly thereafter, and examined the locking device, which seemed to be in good condition. It will be unnecessary to detail all the facts with reference to the tension of the spring because it is admitted by defendant that it had not been "finally" adjusted, the contention being it could not be so adjusted until the glass had been installed, and, the door painted. The defendant's own witness, Stremming, testified that after Schuester was hurt he, the witness, had "an awful time getting the door down;" and that when it elevated when Schuester was hurt, the vibration was such that "it seemed like the whole roof was caving in." Evidence on the part of both plaintiff and defendant as to the operation of the door both before and after plaintiff was injured is reflected by the following excerpts: "awful fast; turn it loose, and it would just fly;" "It seemed pretty hard" [to pull down]; "It would go up

fairly rapidly;" "It was hard to get the door down;" "It didn't work as free as it should have;" "When I finished the door and you would unlock the door, the door would go up fast;" "It started up by itself when you unlocked the door [which] isn't the normal operation of that kind of door;" "The door raised faster than it should have."

Plaintiff testified that about 12:30 P. M on the day in question, and just after eating his lunch, he returned to his work and found the glaziers, Dieckman and Luebbers, had come to install the glass. Luebbers was starting to pull the door down with the rope. Plaintiff's boss had informed him before lunch that the "glaziers were going to be on the job, and for me to take that door and get it down and make it safe for them." Plaintiff said to Luebbers, "Don't fool around it now. That door is dangerous. A fellow got sent to the hospital yesterday with it; it flew up and knocked him off the ladder. Now don't play around it at all until I make it safe." He and the glazier pulled the door down, and plaintiff turned the locking device "until the night latch come up and clicked locked, and the bolt was through the track . . . five-eighths to three-quarters of an inch." He stood on the plate until the lock clicked, then told Luebbers, "Let loose of her now. Stay away from it; don't touch it; leave her right there." He testified he then walked back in the building some fifty to seventy-five feet, procured a ladder and block of wood, drove a nail through the block, returned to the door and again saw the locking bar protruding through the keeper in the guide rail, then mounted the ladder some 5 or 6 feet, "and reached up my arms to set the block and bring my hammer back to hit the nail. Before I ever got a chance to hit the nail, the door rushed right up in front of me just like a streak of lightening . . . it whirled me around and throwed me down on the concrete floor." The nature and extent of the injuries sustained in consequence of the fall will be discussed in connection with the contention that the verdict is excessive. It was shown that the door and lock had not been touched after the lock was set. Dieckman's testimony was substantially to the same effect. When the door had been pulled down, he saw plaintiff manipulate the lock, but on cross-examination he admitted he did not observe whether or not the lock was "actually locked." Luebbers, who had been a glazier for 52 years, testified positively that he saw plaintiff "set the lock" and saw that "the plunger went all the way over." In that connection, he further testified, "I was standing right there, and I seen the lock was secured, but the minute he got up on that ladder, we heard something click . . . and he was gone."

After plaintiff was injured, the lock was examined and found to be intact, nor did the track or guide rail appear to be damaged. Luebbers testified that he and Dieckman after nailing a block on the jamb

above the door, completed the job of glazing, and then got up and removed the block, while Dieckman held on to the door, at which time it again elevated "right fast" ["away she went; it didn't stop"], with all of the glass in place and "with the lock locked." Dieckman testified to the same effect, except as to the lock being locked as to which he does not appear to have been examined. Luebbers was not present, but ▇▇▇ his testimony given at a prior trial was read.

An expert called on behalf of plaintiff, testified in answer to a hypothetical question that the cause of the rising of the door under the facts as hereinabove outlined "would have to be either . . . that the lock failed in such manner that it released itself in the track, . . . or there was enough . . . sideplay . . . that is, the sidetracks were far enough apart so that the door could shift enough to disengage the lock and allow it to fly up that way."

Defendant contends we "should reject the testimony of the plaintiff, Burneson, and of the witness Luebbers, because it is contrary to the physical facts and known physical laws or is the result of evident mistake or ignorance," thus bringing the case within the doctrine of Weaver v. Mobile & Ohio Railroad, 343 Mo. 223, 120 S. W. (2d) 1105; Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Sexton v. Metropolitan Street Ry. Co., 245 Mo. 254, 149 S. W. 21, and others cited. The argument runs about like this: That "the only evidence in the case which definitely described the manner in which the floating brackets were attached" [introduced by defendant]. disclosed that they were so installed as to allow a lateral displacement of only five-sixteenths of an inch; therefore "if pressure was applied . . . in the direction opposite the locking device, the door could not be laterally displaced in excess of five-eighths of an inch, which would still leave the locking bar protruding through the keeper a distance of one-eighth of an inch plus the bearing surface of the keeper, which was also one-eighth of an inch in thickness." But this argument is founded on *defendant's* evidence as to the amount of sideplay, which is contrary to the rule that, on demurrer, defendant's evidence must be disregarded except insofar as it may tend to aid plaintiff's case. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.] Plaintiff testified the locking bar protruded from "five-eighths to three-quarters of an inch" through the keeper so that, taking the minimum figure fixed by him, even under defendant's theory as to the amount of sideplay, it appears that the extent of protrusion of the bar through the keeper might have been reduced to the diameter of the bearing surface of the keeper, or one-eighth of an inch. In the light of the positive and direct evidence as to the behavior of the door at the time plaintiff was struck and injured, as well as prior and subsequent thereto, we are of the opinion that the matters and things complained of by defendant were matters

of fact for the consideration of the jury. It having passed on the credibility thereof, and the facts of the case not bringing it within the rule of the cases relied on, we may not overturn the verdict.

II. Defendant assigns error in the giving of plaintiff's instruction No. 1 as (1) submitting a general allegation of negligence which had been superseded by a specific charge, thereby broadening the issues as made by the pleadings, and hypothecating facts not justified by the evidence; (2) ignoring uncontradicted facts; and (3) because misleading and confusing. The petition alleged the negligence relied on in the following language: "That the defendant, its agents and servants, carelessly and negligently *failed and neglected to make said overhead door reasonably safe* for plaintiff to work upon, when the defendant knew, or by the exercise of ordinary care could have known, that persons and plaintiff were required to perform certain work thereon, and would be likely to be injured *by reason of the fact that the spring attached to said door and which was intended to automatically raise said door was so carelessly and negligently adjusted by the defendant, its agents and servants as to cause said door to be suddenly and with great force moved and thrown upwardly* and to cause plaintiff to be thrown as aforesaid, and to cause plaintiff to. suffer and sustain the following serious and permanent injuries:"

The italicized portion of the instruction is that concerning which the first complaint is made: ". . . and if you further believe and find from the evidence that said injuries, if any, *were caused by reason of the fact that the defendant, its agents and servants, failed and neglected to make said overhead door reasonably safe for plaintiff to work upon,* and that the defendant, its agents and servants knew, or by the exercise of ordinary care could have known that plaintiff would be required to perform certain work thereon, and would be likely to be injured by reason of the fact that the spring attached to said door was so negligently and carelessly adjusted by the defendant, its agents and servants, if you so find, as to cause said ▮▮▮ door to be suddenly and with great force moved and thrown upwardly, if you so find, then your verdict should be in favor of the plaintiff and against the defendant." Even if we allow defendant's contention that the general charge [failure to make the door safe for plaintiff to work on] was superseded by the allegation of specific acts of negligence [the careless and negligent adjustment of the spring], it would not necessarily follow that the instruction violates the rule that where a general allegation of negligence in a petition is followed by a charge of specific acts of negligence, the plaintiff must recover, if at all, upon the specific acts thus alleged. [Zasemowich v. American Mfg. Co. (Mo.), 213 S. W. 799, and cases cited.] This for the reason that it will be observed the instruction does not authorize

a verdict upon the finding alone that defendant failed and neglected to make the door reasonably safe for plaintiff to work upon, but it also required the jury to find, in the conjunctive, the issue of the negligent adjustment of the spring. The effect was to place an additional burden on plaintiff, of which defendant cannot complain. [McIntyre v. Frisco Ry. Co., 286 Mo. 234, 227 S. W. 1047; Turnbow v. Rys. Co., 227 Mo. 644, 211 S. W. 41; Brackett v. Masonry Co., 326 Mo. 387, 32 S. W. (2d) 288.]

As to the omission of uncontradicted facts, it is sufficient to say that defendant's witness Miller testified both ways [one way by deposition, and the other at the trial] as to whether, when he left the job after installing the door, he pulled it down and locked it by means of the locking device and also by nailing a block of wood on the jamb above the door. So it cannot be said that the evidence on that point was uncontradicted. Nor do we think the phrase objected to was likely to mislead or confuse the jury by causing it to take into consideration a possible failure of the locking device and a possible lateral movement of the door under the general charge of negligence of failing to make the door reasonably safe for plaintiff to work upon. Defendant concedes in its argument that had the objectionable phrase "been eliminated from the instruction . . . and had the instruction limited plaintiff's right to recovery upon the specific act of negligence pleaded, namely, the negligent adjustment of the spring, then there would have been no possibility of the jury having been misled or confused as to the issues involved." This is in reality but another argument in support of the point we have just ruled. Plaintiff was relying on the charge of negligent adjustment of the spring. He did not charge negligence with respect to the lateral displacement of the door or the locking device. The instruction does not predicate recovery thereon, for it says nothing whatever about those subjects. It submitted the hypothesis of negligent adjustment of the spring, which was proper.

III. Plaintiff's instruction No. 4, dealing with the burden of proof on the issue of contributory negligence is challenged as being reversibly erroneous. It tells the jury that the burden of proving any "*act* of contributory negligence" on the part of plaintiff rests upon the defendant. The quoted phrase is repeated four times. But the instruction says nothing with respect to any negligent *omission* on the part of plaintiff, and it is argued that the jury was thereby invited to ignore the defense of plaintiff's negligent omission in failing to securely lock the door, thus misleading and confusing the jury. We think the instruction deficient in the particular mentioned, but that it was cured by defendant's instructions, one of which told the jury "that one of the defenses in this case is contributory negligence" which it expressly defined as "any negligent act or *omission*

on the part of plaintiff which directly contributed to cause him injury," and then hypothesized the alleged negligent omission in question—plaintiff's failure to "lock said door securely" before mounting the stepladder. In other words, defendant's instruction supplemented and explained the instruction complained of by including the element of negligent *omission*. When read together the two instructions are consistent and harmonious, and we think there was no likelihood of the jury being confused thereby. This is within the rule that instructions must be read and construed together and, as a whole, as stating the law for the guidance of the jury. They must not be conflicting, but may be supplementary to or explanatory of each other. [Scott v. First Nat'l Bk. of St..Louis, 343 Mo. 77, 119 S. W. (2d) 929.]

██ ██ IV. We do not regard as error the action of the court in overruling an objection to a hypothetical question ██ propounded by plaintiff's counsel to the expert witness, Chambliss. The ground of the objection was that the question was "too general in character and doesn't specify the weights or forces" referred to in said question. The assumption in that connection was that "when the door is pulled down, it is necessary to use a great deal of force, and that when the door is released it goes up very rapidly, very fast." In the light of the testimony as to the manner in which the door elevated (which has been set out in the statement of the facts), we think further particularization was unnecessary under the objection interposed. Nor was it error to refuse defendant's instruction No. 14 which told the jury "that there is no pleading in this case to the effect that the door mentioned in evidence was installed in such negligent manner as to permit the locking bar mentioned in evidence to slip out of the keeper . . . by the lateral movement of said door and you will therefore disregard any such evidence or inference therefrom." As pointed out in paragraph numbered II above, negligence was not charged with respect to the lateral displacement of the door, but plaintiff was relying on the negligent adjustment of the spring, and this was the ultimate fact in issue. That there was some sideplay is admitted. In fact defendant's evidence shows some was necessary in order that the door might operate. It is not necessary to state in the pleadings the evidence by which the ultimate facts relied on are to be proved. [Mooney v. Monarck Gasoline & Oil Co., 317 Mo. 1255. 298 S. W. 69.]

██ V. This brings us to the question as to whether the damages awarded are excessive. Plaintiff testified he was 40 years old when injured; that he had been a carpenter 15 or 16 years, and prior to his injury he enjoyed good health; at the time of his injury he was earning $10.00 a day, the union scale, which was increased to $12.00 a day on July 1, 1937; that he remained in the hospital until Decem-

ber 6 following the date of his injury; that he was first put on a Bradford frame for two weeks, and then placed in a plaster cast (extending from the neck to the hip) which was removed on December 4. The following day another cast was put on, and the next day he was taken to his home where the second cast was removed and he was placed upon a board where he remained in bed until December 24. After a week or ten days he was able, with the assistance of his wife, to get out of bed and slide over on a chair. Subsequently he was able to walk over and sit in a chair for two or three hours; he slept on a board which was placed in his bed until February, 1936. In March of that year he was able to go outside and was able to walk with the use of a cane. The continued use of the cane was necessary until in the summer of 1936. He further testified he was unable to do any work until the summer of 1937, when he was able to cut grass and do odd jobs around the place; that he tried to hang some small doors for a friend but had great difficulty; that he could not do carpentry on account of climbing, bending, squatting and stooping over, all of which caused him pain; that he suffered pain in his back, wrist, legs, feet and hands, as well as upset stomach and nervousness; that for six or seven months prior to the trial he had had to again resort to sleeping on a board in his bed in order to get any rest; that if he laid in one position too long, he would become stiff and sore; that as late as the date of the trial he could not put pressure on his left hand, and that the pain in his back was still severe, particularly after bending over. On cross-examination he testified he received $20.00 a week under the Workmen's Compensation Act for a period of seventy weeks, and that his hospital and medical bills (amounting, respectively, to $378.60 and $505.00) were paid by the insurance carrier of his employer, the construction company.

The attending physician testified plaintiff "had multiple injuries, bruises, about his body" consisting of the following: a compression fracture of the twelfth dorsal vertebra, known to laymen as "a broken back," which is, in reality, "a jamming together of the vertebra—the bone itself is jammed into itself . . . with consequent damage to the surface of the vertebra;" contusion to the left foot; comminuted fracture of the left wrist "that is the radius, of the large bone of the forearm, with associated fracture of the styloid process of the ulna, the small bone on either side of the elbow, the very tip of the bone," which resulted in a slight deformity. He further testified that on account of the fracture of the wrist plaintiff had some limitation of motion for a long while, and he could not move the hand at the wrist all the way, and that such limitation of motion is permanent; ▮▮▮ that he treated plaintiff until January, 1937, over a period of seventeen months, and examined him a number of times subsequent thereto; that the compression fracture was such as to cause the semi-soft tissue between the vertebra to become calcified

and caused two vertebrae to become fused, which condition is permanent, resulting in some restriction upon the sideward and forward movements of the spine, "considerably handicapping him" in carrying on the duties of a carpenter. He characterized the extent of plaintiff's injuries as "permanent partial." At the time of the doctor's last examination, which was on April 30, 1937, the bone in the wrist was united in a good, firm position, and was as strong as it was before the injury. The plaintiff apparently suffered no loss of weight. He was a large, strong man at the time he was injured and, except for the disabilities mentioned, appeared to be such at the time of trial—there being "many types of work which he can do."

Plaintiff says that a proper award would seem to lie somewhere in the medium between amounts permitted to stand in the cases of Donley v. Hamm (Mo.), 98 S. W. (2d) 966, and Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797. In the former, an award of $10,000.00 to a man, 33 years old, earning $18.00 to $20.00 per week, where the left lamina of the vertebra in plaintiff's neck was fractured but had begun to heal, and where the only evidence of permanent injury was to the soft parts and medical expense was less than $200.00, was held excessive to the extent of $2,000.00. In the Philibert case an award of $19,833.00 was held excessive and reduced to $16,000.00, where a 52 year old employee, who received a salary of about $8.50 a day, sustained severe injuries in the back, shoulders and head, and was still suffering more or less pain twenty months after the injury, and was incapacitated from doing heavy work which had been required of him to some extent. The injuries suffered by the plaintiff are more severe than those in the Donley case, but we are not prepared to say that they are so much less severe than those in the Philibert case that the sum awarded, $15,000.00, should be reduced, as manifestly out of proportion to the injuries proven.

The judgment is, accordingly, affirmed. All concur.