JOSEPHINE GAFFRON, APPELLANT, v. PRUDENTIAL LIFE INSURANCE COMPANY, A CORPORATION, AND JOHN P. DOLAN REALTY COMPANY, A CORPORATION, RESPONDENTS.—187 S. W. (2d) 41.

St. Louis Court of Appeals.   Opinion filed April 17, 1945.

*Frank L. Ramacciotti* and *Roberts P. Elam* for appellant.

*Lon Hocker, Jr., Orville Richardson* and *Jones, Hocker, Gladney & Grand* for respondents.

752

McCULLEN, J.—This action was instituted by appellant, as plain-tiff, against respondents, as defendants, to recover damages for per-

sonal injuries sustained by plaintiff because of alleged negligence of defendants. A trial before the court and a jury resulted in a verdict in favor of plaintiff in the sum of $4000, but the court sustained defendants' motion for a new trial. From the order granting a new trial plaintiff duly appealed.

Plaintiff's amended petition upon which the case was tried alleged that the defendants owned, managed, controlled and operated an apartment building located at 5610 Enright Avenue in the City of St. Louis, and that said building contained a front door entranceway and exit equipped with a heavy screen door, and an automatic door check or stop connected therewith and attached thereto, which was used in common by the various tenants of the defendants occupying said building, their friends, invitees and guests, and defendants provided and maintained the same for such purposes; that on August 14, 1942, plaintiff was an invitee and lawfully upon the aforesaid premises for the purpose of visiting one of the tenants therein; that said front screen door and automatic stop or check were then and there in a defective, dangerous and unsafe condition in that said screen door, when opened, would be caused to close suddenly, violently and with great force, and thus and thereby be likely to strike and injure persons opening said door and using the said doorway and exit; that while plaintiff was in the act of leaving said building and attempting to pass through said doorway said screen door did suddenly, violently and with great force close and strike plaintiff and cause her to be thrown and injured, all as a direct and proximate result of the negligence and carelessness of defendants in the following respects: (1) Defendants knew or by the exercise of ordinary care could have known of the dangerous and defective condition of said door and the automatic check or step attached thereto, in time thereafter to have remedied the same and thereby have avoided the injury to plaintiff, but negligently failed to do so; (2) that defendants failed to warn plaintiff of the dangerous, defective and negligent condition of said door and automatic door stop. Assignments of negligence numbered 3 and 4 are in substance the same and alleged that defendants negligently maintained said door and automatic door stop in the aforesaid dangerous, defective and unsafe condition.

The petition stated in detail the injuries which plaintiff alleged she sustained on the occasion mentioned, but since the injuries and the extent thereof are not involved in this appeal it is unnecessary to set them forth here.

Defendants' answer consisted of a general denial and a plea of contributory negligence which charged that whatever injuries plaintiff may have received on the occasion mentioned were caused by her own negligence in failing to ascertain the number of steps to the door in question before she commenced to descend. Plaintiff's reply was a general denial.

Plaintiff testified that she was a widow, sixty-eight years of age, not employed at the time of the trial, having worked last in business in October, 1940, prior to which, for about ten years, she had worked for American Foods, Inc., where she did all kinds of office work, such as bookkeeping, typing, filing, billing, and writing orders; that in 1941 she did some private work for Mr. Siegel who was president of the above-named firm; that she quit working for Mr. Siegel in April, 1941, because she was having trouble with her eyes; that she had cataracts on her eyes since the fall of 1940; that after she quit working for Mr. Siegel, in April, 1941, her eyes were fairly good and she could see fine at that time and went every place; that on August 14, 1942, she was in defendants' apartment building at 5610 Enright Avenue; that she went there to visit her sister, Mrs. Manley, who was living in that building and was sick at that time; that she had gone into the building about 7:30 in the evening when it was just about dusk but not dark; that she had not been in that particular building before that occasion; that about 10 P. M. she came down from the second floor to leave the building and went through the lobby, pushed the screen door open and just as she was stepping down the door came shut suddenly, struck her, and she fell down the steps and sustained injuries.

The evidence shows that the place where plaintiff sustained her injuries was the front entrance doorway to the apartment building. The doorway in question was back a considerable distance, south from the public sidewalk, and was connected with the public sidewalk by a private sidewalk several feet wider than the entrance to the building. The entrance doorway was large, its bottom level, being also the level of the building lobby, was two steps up from the private sidewalk. Inside the lobby there was a passenger elevator and a stairway leading to the upper floors of the building. On the occasion mentioned the front entrance doorway in question was equipped with a large heavy screen door which was hinged at its east side and opened outwardly. The interior side of the screen door contained no spring or other device for closing the door, but there was an automatic door check or door stop for that purpose at the top of the door on its exterior side. Within the door check was a coil spring which when the door was pushed open was put under tension so as to cause the door to close. The door check had a cylinder which contained oil and a valve with a ball bearing arrangement so that when the spring started to close the door the ball bearing arrangement blocked an opening and, by oil compression, tended to keep the door from closing with force as the powerful spring would otherwise cause it to close. There was a set screw adjustment on the door check by which the flow of oil through the ball bearing valve was regulated, thus regulating the speed of the door in closing. Defendants' maintenance man, describing the operation of the door check, testified: ''whether the

door will slam suddenly, or come closed gradually and slowly, is governed by a set screw that can be adjusted. You can adjust that so that the door will come closed so fast that it will knock you out into the room. You can adjust it so that the door will close fast or slow. You can adjust it by the screw, so that the door will come closed very gradually just like that (illustrating), and you can also adjust it so it will come closed real fast. You can also adjust that screw so that the door will stand open and won't close at all.'' Said witness also testified that the closing of the door with a bang would indicate that the set screw on the door check was not properly adjusted and the door not working properly; that improper functioning of the door also could result from the setting of the door, insufficient oil in the door check cylinder, corroded oil or hard oil in the cylinder, or worn or defective threads on the regulating set screw.

Plaintiff testified that as she was leaving the lobby of the building by way of said front entranceway she pushed on the west side of the screen door which caused the door to open, and then undertook to step down from the lobby level to the step below; that the door went beyond her hand so that her hand was off the door as she undertook to step down; that she knew the door had a door check with a spring attached to it but didn't expect the door to close quickly when she took her hand off it because she expected the door check to hold it open until she passed through the doorway; that she was not watching the door but was watching where she was going to step; that while she was balanced on one foot in the act of stepping down to the step below, but before she has stepped on that step, the door came shut suddenly and fast, ''real sudden, just snapped right back at me''; that the door struck her hard on the right side and caused her to lose her balance and to be thrown to the west against the west side of the doorway and from there on to the west side of the sidewalk in front of the building.

Plaintiff further testified that she never touched the step on to which she intended to step, but was thrown onto the sidewalk in a sitting position, partly on and partly off the sidewalk with the bone of her upper left leg on the edge of the walk, and with her head in some bushes to the west of the sidewalk; that the numbr of steps did not interfere with her or have any connection with her injury, and that the condition of her eyes did not cause her to lose her footing or make a misstep or anything of that sort. Plaintiff being asked on cross-examination, ''What was it that caused you to fall?'', answered: ''The door hitting me.''

Mary W. Bloom testified on behalf of plaintiff that she had been a friend of plaintiff's sister and visited the sister regularly once a week; that shortly after plaintiff's sister moved into the apartment building in question she, the witness, went to visit plaintiff's sister on the 2nd, 3rd, 4th or 5th of August, 1942; that on that occasion, as she was entering the building, the front screen door closed on her heel. Re-

ferring to the door, the witness testified: "it started off and all at once like it loosened and hit me on the heel. I took my hand in the back and held the door and raised my foot out. It caught the runner and caught my stocking. But after that I always watched the door, because I didn't know how it would act;" that after that experience she always used precaution; that she didn't trust the door and held on to it until she had both feet going in the door; that she never gave the door another chance to fly back at her. The witness testified on cross-examination that prior to the occasion of her experience with the door she thought the door check would give her ample time to go through the doorway after she had let go of the door for that purpose, but that the door closed faster than she thought it should and struck her on the heel; that she did not consider her experience with the door of any importance unless after she learned of plaintiff's injury; that she thought it was a "trivial" thing and "gave it no more thought," and "thought very little of it because I thought I didn't hold it far enough." Concluding her cross-examination, the witness testified:

"Q. Did it close faster that day? A. I never had occasion to time it.

"Q. Did it close faster that day that it caught you on the heel than your screen doors close at home? A. I couldn't tell the timing on the door."

Marjorie Pond testified as a witness for plaintiff and identified the hospital records showing plaintiff's confinement in the hospital as the result of her injuries.

Dr. H. R. McCarroll testified as a witness for plaintiff and described the nature and extent of plaintiff's injuries and the treatment therefor.

Margaret Manley testified on behalf of defendants that she lived at 5602 Enright Avenue, which is an apartment next to the apartment building No. 5610 Enright Avenue; that she was not related to plaintiff except by marriage, plaintiff being her husband's aunt; that her mother-in-law, Mrs. Manley, Sr., came to the witnesses's apartment every Thursday to spend the day and quite often plaintiff would come and spend the day too. The witness stated that she was in her apartment on the night of August 14th when plaintiff was injured; that her mother-in-law called her on the telephone and she went immediately to see what had happened and found plaintiff lying halfway on and halfway off the sidewalk; that plaintiff said to her: "Oh, Margaret, I think I have broken my leg; I must have missed the step"; that she told plaintiff that she would get someone to help pick her up; that she asked two men, Mr. Kroll and Mr. Africa, to help her carry plaintiff, which they did, and took her up to the apartment of the witness's mother-in-law at 5610 Enright; that the witness saw her mother-in-law, Mrs. Manley, Sr., up there at that time. At this point the witness, referring to plaintiff, testified: "Mrs. Gaffron kept repeating over and over she missed the steps. She said, 'I thought that I was in

your apartment.' She said that she had that evening come first to my apartment, just got into the lobby and noticed she was in the wrong apartment.'' The witness further testified that she called Dr. Yarbrough, then called plaintiff's other sister, and plaintiff was then taken to St. Luke's Hospital.

John Kroll testified on behalf of defendants that he lived at 5610 Enright and had lived there for about six and one-half years; that the first he knew of plaintiff's injuries was when Mrs. Manley, Jr., asked several of them to help pick up her aunt who had fallen and that he and another young man went over there and picked her up; that she was lying on the west end of the building and Mrs. Manley, Jr., opened the door for them so they could carry plaintiff into the elevator and then up to the elder Mrs. Manley's apartment where they put her on a bed; that when they started to pick plaintiff up she was on her elbow and said: ''Be careful; don't let me drop; don't let me fall; I just missed that step''; that that was all plaintiff said; that she kept repeating that.

Mrs. John J. Kroll testified as a witness for defendants that she lived with her husband, John J. Kroll, at 5610 Enright Avenue and that they had been living there close to seven years at the time plaintiff was injured at the entrance to the building; that she had been going in and out of that door several times a day that summer and there was nothing wrong with that door. The witness was cross-examined with respect to an interview with plaintiff's counsel about a year prior to the trial and testified:

''Q. Do you remember, Mrs. Kroll, stating to me with respect to the door that the door operated one time very fast and at other times it would stand ajar? A. No, sir, I never did say that.''

Leon Cooley testified on behalf of defendants that he was janitor and maintenance helper at the apartments No. 5602 and No. 5610 Enright Avenue; that he was familiar with the screen door in front of 5610 Enright Avenue as it was in the summer of 1942; that he himself put on that door; that he lived in the rear of No. 5610 and in going about his duties on the premises he would go through that door fifteen or twenty times a day; that it was his job to see that the doors were kept in good condition; that the door check in question worked like any other door check. On cross-examination the witness testified that the door check was never taken off from the time they took the screens down until they put them up again each year; that the door checks are left on the doors when the doors are stored for the winter; that the door check on the door at the time of the accident involved herein was a Wilcox; that plaintiff's Exhibit I, a picture taken October 21, 1942, showed that the door check on the door at that time was a Corbin; that the witness didn't know when the Corbin was put on and the Wilcox removed after the accident; that he knew there was no Corbin door check on the door in August, 1942, but that it was a Wilcox door

check, which is similar to a Corbin; that the Wilcox door check operated with a strong coil spring inside of it, "a very powerful spring." We have heretofore set forth the exact testimony of the witness in describing the operation of the door check that was on the door at the time plaintiff was injured.

In rebuttal plaintiff testified that she did not on the occasion of her injury or any other time tell Mrs. Manley, Jr., that she missed her step; that she didn't make a statement like that because she didn't miss her step; that she said to the men who carried her upstairs, "Don't let me fall; I am hurt; I am hurt enough already."

The trial court sustained defendants' motion for a new trial on the ground that it had erred in refusing to give and read to the jury defendants' instruction in the nature of a demurrer to the evidence offered at the close of plaintiff's case and at the close of all the evidence; and that it had erred in giving Instruction No. 1 requested by plaintiff.

The parties are agreed that this case is not within the doctrine of *res ipsa loquitur*. Plaintiff, however, earnestly insists that the court erred in granting defendants a new trial, and argues that there was ample substantial evidence to show that the screen door and its attached door check were in a defective, dangerous and unsafe condition, and that defendants were negligent in maintaining and failing to remedy that condition, and that such negligence was the proximate cause of plaintiff's injuries.

In determining whether or not plaintiff adduced sufficient evidence to require the submission of her case to the jury, we must be guided by the long established rule which has been applied in cases too numerous to cite here. The leading case on the subject is Young v. Wheelock, 333 Mo. 992, 1001, 64 S. W. (2d) 950, 954, wherein our Supreme Court said that:

". . . a defendant's demurrer to the plaintiff's evidence admits as true every fact and circumstance which plaintiff's evidence tends to prove; that plaintiff is entitled to the benefit of every inference of fact which may reasonably be drawn therefrom; that the evidence must be considered in the light most favorable to the plaintiff; that the defendants' evidence must be disregarded except insofar as it may tend to aid plaintiff's case; and that such a demurrer can be sustained only when the facts in evidence and the legitimate inferences to be drawn from such facts are so strongly against plaintiff as to leave no room for reasonable minds to differ. [Citing cases.]"

Having all the elements of the above rule in mind, we believe there can be no doubt that plaintiff adduced sufficient evidence to show that she was injured by reason of the sudden closing of the screen door as she was passing through the doorway in leaving the apartment building, and that the screen door struck her violently and with such force as to cause her to be thrown to the sidewalk outside the building, whereby she sustained injuries. However, this is not a *res ipsa loquitur*

case and it remains to be determined whether or not the evidence was sufficient to show that plaintiff's injuries were the direct result of any negligence of defendants. Before defendants can be held to have been guilty of negligence in this case, plaintiff must show not only that the screen door and automatic stop or check attached to it were at that time in a defective and unsafe condition, but in addition thereto she must show that defendants had actual or constructive knowledge of such defective and unsafe condition in time wherein by the exercise of ordinary care they could have remedied the same and thus have avoided her injuries.

Plaintiff argues that the evidence shows that the automatic door check contained "a very powerful spring" which was put under tension when the door was pushed open and then tended to close the door, and discusses in detail the manner and means by which the door check operated and how it could be adjusted so that the door would slam suddenly or come closed gradually and slowly. Plaintiff also points out that the door check could be adjusted so that the door would come closed so fast "that it would knock you out into the room," and asserts that the evidence shows that the setscrew on the door check could be adjusted so that the door would stand open and wouldn't close at all, and that if the door would come closed with a bang—that is, with great speed and violence, that would be indicative of improper adjustment and would show that the door check was not operating properly.

We think it would not aid in the solution of the problem before us to discuss the different results that would or could follow from the various possible adjustments and operating conditions of the automatic door check mechanism mentioned by plaintiff. There is no evidence whatsoever that any of the parts of the door check mechanism were broken or unworkable or missing, but notwithstanding the absence of such evidence plaintiff's own testimony that the door closed on her suddenly, violently and with great force, which we must take as true, was sufficient to warrant a finding that the manner in which the screen door struck plaintiff was caused by a lack of proper adjustment of the mechanism which controlled the operation of the automatic door check. Although there is no direct evidence to show that the automatic door check mechanism was out of proper adjustment, we nevertheless believe that under all the evidence, and from the violent manner in which the door closed and struck plaintiff, the jury could properly infer that the door check mechanism was not in a reasonably safe operating condition for the use of defendants' tenants and invitees, and that plaintiff's injuries directly resulted from said unsafe condition. However, we believe also that the evidence was not sufficient to show that defendants had knowledge of such unsafe operating condition of the door check or that they could by ordinary care have had knowledge

thereof in time to have remedied it and thus avoided plaintiff's injuries.

Plaintiff relies upon the testimony of Mary W. Bloom to show that defendants knew, or by the exercise of ordinary care could have known, of the dangerous and unsafe operating condition of the screen door and the door check thereon in time to have remedied the condition before plaintiff was injured. A review of said witness's testimony fails to show knowledge, either actual or constructive, on the part of defendants of said unsafe condition of the door check. It will be recalled that Mrs. Bloom testified that about ten days before plaintiff was injured she, the witness, was entering the apartment through the doorway in question and that while she was doing so the screen door "started off and all at once like it loosened and hit me on the heel."

Mrs. Bloom did not testify that the door closed on her suddenly, violently and with great force. On the contrary, she said she never had occasion to time it and that when her heel was caught she couldn't tell the timing on the door. She testified that she thought the occurrence was "a trivial thing," and that she "gave it no more thought." She also testified that she "thought very little of it because I thought I didn't hold it far enough," and that she "didn't hold the door going in." She did not say that her heel caught because of the fact closing of the door, although she did state her own conclusion that thereafter she would hold the door so as never to give it "another chance to fly back at me."

We are of the opinion that there is such a wide difference between what happened on the occasion when Mrs. Bloom's heel was caught in the door and what happened on the occasion in suit that Mrs. Bloom's testimony cannot be said to afford a sufficient basis from which to infer that the door was in the same condition on both occasions with respect to the manner in which it operated. It is to be noted that Mrs. Bloom was "entering" the building when her heel was caught by the door, whereas plaintiff was "leaving" the building when she was struck by it. It cannot reasonably be said that a person "entering" the doorway in question is in the same or a similar position in relation to the door as a person "leaving" the building by said doorway. Furthermore, the testimony of Mrs. Bloom does not show anything with respect to the distance that she opened the door to enter, or the speed with which the door closed on her heel. In "entering" the building she, of course, was required to pull the door toward her, and in passing through the doorway she had the door at her back and could not see its speed as it closed. In "leaving" the building plaintiff had the door in front of her and was required to push it ahead of her to open it. When the door caught Mrs. Bloom's heel she was inside of the building, whereas when the door struck plaintiff she was outside of the building and was knocked to a point some distance away from the door by the violent force of the door striking her. There is noth-

ing in Mrs. Bloom's testimony to show or to warrant an inference that the door closed on her with anything like the force with which it closed on plaintiff. There are other clear points of difference in the circumstances surrounding the incident in which Mrs. Bloom was involved and those present when plaintiff was struck by the door in question, but we think those referred to are sufficient to show that the two occurrences were not similar and the proof of the incident involving Mrs. Bloom really throws no light on the condition of the door at the time involved in this action. Although we must take Mrs. Bloom's testimony as true, and give plaintiff the benefit of all reasonable inferences arising therefrom, we are not authorized to magnify beyond its reasonable value as evidence an incident which the witness herself called "trivial" and which occurred because, as she said in referring to the door, "I thought I didn't hold it far enough." The burden of proving that Mrs. Bloom's experience with the door was substantially similar to that of plaintiff rested on plaintiff. We think plaintiff failed to sustain that burden and the testimony of Mrs. Bloom was, therefore, of no probative value. [Poe v. Illinois Cent. R. Co., 335 Mo. 507, 73 S. W. (2d) 779; 45 C. J. 1245.]

Inasmuch as Mrs. Bloom's testimony failed to show an unsafe, defective or dangerous condition of the screen door or its closing mechanism at the time the door caught her heel, it follows that there was no evidence to show that defendants negligently permitted an unsafe condition thereof to exist prior to the time plaintiff was injured. To hold otherwise would be equivalent to holding that defendants were insurers of the safety of their tenants and invitees in the use of a simple doorway equipped with a screen door with a device attached to close it, such as is in common use for that purpose on buildings throughout the land.

We know of no rule of law or decision of a court that holds the owner or occupant of premises, such as the apartment building involved herein, to be an insurer of the safety of persons who occupy the status of invitees thereon. On the contrary, the books are filled with decisions holding that such an owner or occupant is bound to exercise only ordinary care to provide a reasonably safe entrance and exit to and from such a building, and is liable to invitees only for injuries resulting from an unsafe condition of the premises which is known to the owner or occupant and not known to the invitee, and which the owner or occupant has negligently permitted to exist and of which the invitee has received no notice or warning. [Vogt v. Wurmb, 318 Mo. 471, 300 S. W. 278, and cases cited therein.]

Plaintiff strongly relies on the case of Martin v. Mo. Pac. R. Co. (Mo. App.), 253 S. W. 1083, in support of her contention that the order of the trial court granting defendants a new trial should be reversed and that said court should be directed to enter final judgment for plaintiff upon the verdict. We have read the cited case

carefully and believe that it does not constitute authority warranting a reversal of the judgment herein. The plaintiff in that case was injured while leaving defendant's railroad station through a doorway which was equipped with a heavy door attached to which was an automatic door check. While she was going through the doorway the door closed "with a slam" and struck her with such violence as to knock her down. The court held that the defendant's demurrer to the evidence was properly overruled and based its holding on the evidence showing that the spring on the automatic check "was an extra heavy strong spring," and the further evidence "that it came very near throwing Dr. Bell (a witness) out two or three times; that it would come part of the way pretty fast, a little over halfway; that when it first started to close it would come quick and fast; that it would come back to within ten inches of the facing at full speed." The witness, Dr. Bell, mentioned by the court in its opinion, testified that they "had to have a pretty strong spring on that kind of a door, but this was excessively heavy, because it came very near throwing me out two or three times." The court further said that there was "evidence that the spring was so adjusted as to make its action unreasonably strong."

The Martin case, *supra*, is in our opinion clearly distinguishable from the case at bar in that we do not have in this case any such evidence as that referred to above. In the case at bar there is no evidence that defendants had any actual knowledge that the automatic door check was out of proper adjustment or was in an unsafe operating condition at the time plaintiff was injured. Nor was there any evidence of probative value that defendants by the exercise of ordinary care could have known that said door check was in an unsafe operating condition in time thereafter to have remedied it before plaintiff was injured.

Another case cited by plaintiff in support of her contention herein is Burneson v. Zumwalt Co., 349 Mo. 94, 159 S. W. (2d) 605. In that case plaintiff, a carpenter foreman employed by a construction company, brought an action under the third party section of the Workmen's Compensation Act, Revised Statute Missouri 1929, section 3309 (Mo. St. Ann., sec. 3309), now Section 3699 (Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3699), against the defendant, a subcontractor, for injuries he sustained by having been knocked from a ladder as he was about to nail a block of wood on the jamb above an overhead door which was being installed in a building. Plaintiff therein alleged that the door was caused to suddenly elevate with great force by reason of the negligent adjustment of the torsion spring connected with the door, notwithstanding the fact that he had secured the door by the lock provided for that purpose. There was a judgment for plaintiff and the defendant appealed. The Supreme Court affirmed the judgment.

In said Bourneson case the opinion shows that the door involved therein was nine feet in width, eleven feet in height, and 1¾ inches in thickness; that it consisted of six horizontal or cross-wise sections, each of which were divided into six panels; that the two lower horizontal sections were solid wood, and the four upper sections were constructed to accommodate six panes of glass in each; that there were twenty-four window panes, in rows of six across, four deep; that the panes of glass weighed forty-eight pounds in the aggregate; and that the door weighed approximatly 400 pounds; that the horizontal sections were held together at the outside edges by ten hinges, five on each outer edge of the door; that the sections were also hinged in the center of the door, and that the hinges on the outside edges had a shaft or pin on which a wheel or roller operated in a "C"-shaped steel track which was bolted to the vertical jambs of the door; that there were also two lower and two upper rollers or wheels which were not hinged, but had floating brackets or shafts; that the track curved near the top of the door and extended horizontally a distance of about twelve feet, thus permitting the several hinged sections to take the turn on the radius where the door went overhead into a horizontal position. The door was equipped with a locking device mounted on the inside thereof by means of metal brackets attached to the second section from the bottom of the door, which consisted of a metal bolt or bar "about 1 inch high and ⅛ inch thick" and two feet in length. After giving a further detailed description of the door and its mechanism, the Supreme Court stated that attached to the jamb above the door was a shaft upon which was mounted the torsion spring in question, which was about two and one-half feet in length and approximately four inches in diameter; that it was circular in shape, and made from material approximately ⅜ or ⅝ of an inch in diameter; that the spring was hooked onto a shaft and there was a drum on each end of the shaft with a cable wound on the drum; that the cable ran down to the bottom of the door and that when the door was up, as the door would be pulled down, the shaft, the cable would spin the shaft and the shaft would wind the spring; that the farther it would be pulled down the harder the tension would get, by winding up with the cable; that there were ropes attached to each side of the casing which ran through pulleys attached at the lower edges of the door which provided a means for pulling down the door when it it would be otherwise out of reach.

In said Burneson case it was contended that the trial court should have directed a verdict for defendant because plaintiff's theory as to the sudden elevation of the door was contrary to the physical facts of the case and contrary to known physical laws, and that the court should reject the testimony of plaintiff and of another witness because it was contrary to the physical facts and known physical laws, or was the result of evident mistake or ignorance. The court pointed

out that defendant's argument was founded on defendant's own evidence in relation to the construction and operation of the door, and held that the matters complained of by defendant were simply matters of fact for the consideration of the jury.

It further appears from the opinion in the Burneson case, *supra*, that evidence was adduced without objection that about 8:30 A. M. on the day before plaintiff was injured another workman was seriously injured by the sudden elevation of the same door while he was standing on a ladder and attempting to remove a block of wood which had been nailed on a jamb above the door. The defendant was notified of this occurrence and the next morning notified one of its workmen to inspect the door but on account of other work the workman did not reach the scene of the accident until after plaintiff had been injured.

We are of the opinion that the door and the mechanism attached thereto involved in the Burneson case, *supra*, were of such a complicated nature as to afford no basis of comparison with the simple screen door and door check involved in the case at bar. Furthermore, in the Burneson case the evidence showed that on the preceding day the same door had acted in a manner exactly similar to the way in which it acted at the time plaintiff therein was injured and that the defendant was actually notified thereof. There is no such evidence in the case at bar. We believe that the Burneson case does not constitute authority for determining the case at bar.

We agree with the trial court's ruling that it committed error in refusing defendants' request for a directed verdict in their favor, but we hold that it corrected its own error by granting defendants a new trial. Therefore, the order granting a new trial is affirmed and the cause remanded for such new trial. *Hughes, P. J.,* and *Anderson, J.,* concur.